2024 WL 244359
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

Priscilla VILLARREAL, Plaintiff—Appellant,

v.

The CITY OF LAREDO, TEXAS; Webb County, Texas; Isidro R. Alaniz; Marisela
Jacaman; Claudio Trevino, Jr.; Juan L. Ruiz; Deyanria Villarreal; Enedina
Martinez; Alfredo Guerrero; Laura Montemayor; Does 1-2, Defendants—Appellees.

No. 20-40359
|
FILED January 23, 2024

Appeal from the United States District Court for the Southern District of Texas, USDC No. 5:19-CV-48, John A. Kazen, U.S.
Magistrate Judge

## Attorneys and Law Firms

JT Morris (argued), Conor T. Fitzpatrick, Attorney, Foundation for Individual Rights & Expression (FIRE), Washington, DC,
Darpana Sheth, Esq., Foundation for Individual Rights & Expression, Philadelphia, PA, for Plaintiff—Appellant.

William Michael McKamie, Esq. (argued), Alicia K. Kreh, Taylor, Olson, Adkins, Sralla & Elam, L.L.P., Fort Worth, TX, for
Defendants—Appellees The City of Laredo, Texas, Claudio Trevino, Jr., Juan L. Ruiz, Deyanria Villarreal, Enedina Martinez,
Alfredo Guerrero, Laura Montemayor; Does 1-2.

Jason Eric Magee (argued), Allison, Bass & Magee, L.L.P., Austin, TX, for Defendants—Appellees Webb County, Texas, Isidro
R. Alaniz, Marisela Jacaman.

Jaba Tsitsuashvili, Anna Bidwell, Attorney, Caroline Grace Brothers, Patrick M. Jaicomo, Institute for Justice, Arlington, VA,
Arif Panju, Institute for Justice, Texas Chapter, Austin, TX, for Amicus Curiae Institute for Justice.

Cynthia Fleming Crawford, Senior Counsel, Americans for Prosperity Foundation, Arlington, VA, for Amicus Curiae Americans
for Prosperity Foundation.

Kathryn Cherry, Office of the Attorney General, Office of the Solicitor General, Austin, TX, Lanora Christine Pettit, Office of
the Texas Attorney General, Solicitor General Division, Austin, TX, for Intervenor State of Texas.

Laura Lee Prather, Counsel, Haynes & Boone, L.L.P., Austin, TX, Paul Christopher Watler, Jackson Walker, L.L.P., Dallas, TX,
for Amici Curiae Texas Press Association, Texas Association of Broadcasters, Freedom of Information Foundation of Texas,
Society of Professional Journalists.

Brianne Jenna Gorod, Constitutional Accountability Center, Washington, DC, for Amicus Curiae Constitutional Accountability
Center.

Rory Thomas Gray, Alliance Defending Freedom, Lawrenceville, GA, John J. Bursch, Alliance Defending Freedom,
Washington, DC, for Amicus Curiae Young America's Foundation.

Hiram Stanley Sasser, III, First Liberty Institute, Plano, TX, for Amici Curiae James O'Keefe, Project Veritas, Incorporated.

Laura Lee Prather, Counsel, Haynes & Boone, L.L.P., Austin, TX, for Amici Curiae Brechner Center for Freedom of
Information, News Leaders Association.

Thomas S. Leatherbury, Esq., Thomas S. Leatherbury Law, P.L.L.C., Dallas, TX, Garrett Meisman, Attorney, Vinson & Elkins, L.L.P., Houston, TX, Peter Steffensen, Southern Methodist University, Dedman School of Law, Dallas, TX, for Amicus Curiae Journalists.

Jay Remington Schweikert, Cato Institute, Washington, DC, for Amicus Curiae Cato Institute.

Paul Christopher Watler, Jackson Walker, L.L.P., Dallas, TX, for Amici Curiae Reporters Committee for Freedom of the Press, Texas Tribune, Dallas Morning News, National Association of Hispanic Journalists.

Jacob Thomas Crump, Covington & Burling, L.L.P., Washington, DC, for Amici Curiae Electronic Frontier Foundation, National Press Photographers Association, Pelican Institute for Public Policy.

Before Richman, Chief Judge, and Jones, Smith, Stewart, Elrod, Southwick, Haynes, Graves, Higginson, Willett, Ho, Duncan, Engelhardt, Oldham, Wilson and Douglas, Circuit Judges. [*]

**Opinion**

Edith H. Jones, Circuit Judge:

**\*1** **Priscilla** **Villarreal** alleged First and Fourth Amendment § 1983 claims arising from her brief arrest for publicly disseminating nonpublic law enforcement information, including the identities of a suicide and deceased motor vehicle accident victims. The district court dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because the officials involved were entitled to qualified immunity.

**Villarreal** was arrested for illegally soliciting information that had not yet been officially made public "with intent to obtain a benefit." TEX. PENAL CODE § 39.06(c), (d). The arrest warrants were approved by the Webb County District Attorney's office and by a magistrate. We do not reach the ultimate question of this facially valid statute's constitutionality as applied to this citizen-journalist. Federal courts do not charge law enforcement officers with predicting the constitutionality of statutes because the Fourth Amendment's benchmark is reasonableness, and "[t]o be reasonable is not to be perfect." *Heien v. North Carolina*, 574 U.S. 54, 60, 135 S. Ct. 530, 536, 190 L.Ed.2d 475 (2014). Moreover, the statute is not "obviously unconstitutional" as applied here.

**Villarreal** and others portray her as a martyr for the sake of journalism. That is inappropriate. She could have followed Texas law, or challenged that law in court, before reporting nonpublic information from the backchannel source. By skirting Texas law, **Villarreal** revealed information that could have severely emotionally harmed the families of decedents and interfered with ongoing investigations. Mainstream, legitimate media outlets routinely withhold the identity of accident victims or those who committed suicide until public officials or family members release that information publicly. **Villarreal** sought to capitalize on others' tragedies to propel her reputation and career.

For a number of reasons, the officials were entitled to qualified immunity and the district court's judgment is AFFIRMED.


# I. BACKGROUND

**Villarreal** is a well-known Laredo citizen-journalist (a/k/a "Lagordiloca") who publishes to over a hundred thousand followers on Facebook. [1] She frequently posts about local police activity, including content unfavorable to the Laredo Police Department ("LPD" or "Department"), the district attorney, and other local officials.

Her complaint alleges that, as a result of her "gritty style of journalism and often colorful commentary," **Villarreal** has critics as well as admirers. The admirers treat her to occasional free meals, and she occasionally receives fees for promoting local

businesses. She has used her Facebook page to ask for and obtain donations for new equipment to support her journalistic efforts. But, she alleges, officials in Laredo city government and the LPD engaged in a campaign to harass and intimidate her and stifle her work.

The events before us began on April 11, 2017, when **Villarreal** published, as a likely suicide, the name and occupation of a U.S. Border Patrol employee who jumped off a Laredo public overpass to his death. She had corroborated this information with LPD Officer Barbara Goodman, her back-channel source, who was not an official city or LPD information officer. Then, on May 6, she posted a live feed of a fatal traffic accident, including the location and last name of a decedent in a family from Houston. Officer Goodman also corroborated the information on this tragic event. In each instance, **Villarreal** went behind the official information channel and published while the incident was being investigated. She acknowledges that for several years she had published information obtained unofficially.

 **\*2**  **Villarreal** alleges that several named Appellees conspired to suppress her speech and arrest her for violating a law they had to know was unconstitutionally applied to her. Facts revealed by publicly available documents and incorporated by reference in **Villarreal's** complaint complete the picture. [2]

LPD investigator Deyanira **Villarreal** ("DV" or "investigator") [3]  is tasked with upholding the Department's professional standards. She received a tip from her colleagues on July 10, 2017, that Officer Barbara Goodman was secretly communicating with **Villarreal**. [4]  Along with the tip, DV noticed that some of the content posted to **Villarreal's** Facebook page was not otherwise publicly available information.

Two weeks later, DV assigned Officer Juan Ruiz to investigate. Ruiz prepared two grand jury subpoenas for phone records from cellphones belonging to Officer Goodman, Officer Goodman's husband, and **Priscilla Villarreal**. Webb County Assistant District Attorney Marisela Jacaman approved the subpoenas.

The phone records revealed that Officer Goodman and **Villarreal** communicated with each other regularly and at specific times coinciding with law enforcement activities. [5]  Ruiz presented to a Webb County magistrate an affidavit in support of a warrant to search Officer Goodman's cellphones. The court approved that search. Officers performed forensic extractions on the phones and sent additional subpoenas for call logs. As a result of the investigation, Goodman was suspended for twenty days.

With evidence in hand, Ruiz prepared two probable cause affidavits to arrest **Villarreal** for her conversations with Officer Goodman that were uncovered during the investigation. In the first conversation, **Villarreal** texted Officer Goodman about the man who committed suicide by jumping from a highway overpass. She asked about the deceased's age, name, and whether he was employed by U.S. Customs and Border Protection. Goodman answered her questions. [6]

 **\*3**  The second conversation involved a fatal car accident. On the date of the accident, **Villarreal** sent dozens of text messages to Officer Goodman. **Villarreal** then posted on Facebook that one person, whom she named, died in the accident. She also disclosed that a family from Houston was in the car and that three children had been med-evac'd to San Antonio. **Villarreal's** text messages asked Goodman about those precise details.

Ruiz's affidavits stated that the information **Villarreal** requested, and Goodman provided, "was not available to the public at that time." The affidavits further stated that by posting this information on her Facebook page "before the official release by the Laredo Police Department Public Information Officer" and ahead of the official news media, **Villarreal** gained "popularity in 'Facebook.' "

Attorney Jacaman approved the two affidavits and submitted them to the Webb County Justice of the Peace. The judge, finding probable cause, issued two warrants for **Villarreal's** arrest for misuse of official information in violation of section 39.06(c) of

the Texas Penal Code. Section 39.06(c) prohibits individuals from soliciting or receiving nonpublic information from a public servant who has access to that information by virtue of her position with the intent to obtain a benefit.

**Villarreal** voluntarily surrendered. She alleges that she was detained, not that she was "jailed," and she was released on bond the same day. **Villarreal** alleges that when she surrendered, many LPD officers and employees, including Enedina Martinez, Laura Montemayor, and Alfredo Guerrero, surrounded her, laughed at her, took pictures with their cell phones, and "otherwise show[ed] their animus toward **Villarreal** with an intent to humiliate and embarrass her."

**Villarreal** petitioned for a writ of habeas corpus. A Texas district court judge granted her petition and, in a bench ruling, held section 39.06(c) unconstitutionally vague. The state did not appeal.

## II. PROCEDURAL BACKGROUND

In April 2019, **Villarreal** sued Laredo police officers, the Doe defendants, the Laredo Chief of Police (Claudio Treviño, Jr.), Webb County prosecutors, the county, and the city in federal court under § 1983 for violating the First, Fourth, and Fourteenth Amendments. She alleged multiple counts, including direct and retaliatory violations of free speech and freedom of the press, wrongful arrest and detention, selective enforcement in violation of equal protection, civil conspiracy, and supervisory and municipal liability.

The defendants moved to dismiss under Rule 12(b)(6) on the basis of their qualified immunity and for failure to state a claim. The district court dismissed all claims. **Villarreal** appealed, excepting her claims against Laredo and Webb County.

Initially, a panel of this court reversed in part and held principally that the defendants were not entitled to qualified immunity because the arrest was "obviously" unconstitutional. *Villarreal v. City of Laredo*, 17 F.4th 532, 541 (5th Cir. 2021). Later, the panel replaced its opinion with a new one but reached the same result. *Villarreal v. City of Laredo*, 44 F.4th 363, 372 (5th Cir. 2022) (opinion on rehearing). Chief Judge Richman concurred in part and dissented in part.[7] *Id.* at 382. The panel opinion was vacated and ordered to be reheard en banc. *Villarreal v. City of Laredo*, 52 F.4th 265, 265 (5th Cir. 2022).

 **\*4**  This court reviews the district court's order granting a Rule 12(b)(6) motion *de novo* to determine whether the facts pled state plausible claims cognizable in law. *NiGen Biotech, LLC v. Paxton*, 804 F.3d 389, 393 (5th Cir. 2015) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)).

## III. DISCUSSION

### A. FOURTH AMENDMENT ARREST CLAIM

We first address **Villarreal's** Fourth Amendment and First Amendment claims against Ruiz for the search warrant affidavits; DV, for her role in the investigation; Does 1 and 2, who tipped off DV; Treviño, who supervises LPD officers; Jacaman, the prosecutor who signed off on the subpoenas and warrant affidavits; and Alaniz, another prosecutor who allegedly endorsed the subpoenas and warrant affidavits. **Villarreal** alleges each of these defendants caused a warrant to issue without probable cause for conduct protected by the First Amendment. Because **Villarreal's** First Amendment free speech claim arises from her arrest and is inextricable from her Fourth Amendment claim, liability for both rises and falls on whether the officers violated clearly established law under the Fourth Amendment. *See Sause v. Bauer*, 585 U.S. ——, 138 S. Ct. 2561, 2563, 201 L.Ed.2d 982 (2018) ("When an officer's order to stop praying is alleged to have occurred during the course of investigative conduct that implicates Fourth Amendment rights, the First and Fourth Amendment issues may be inextricable.").

To obtain money damages against the defendants, **Villarreal** must overcome their qualified immunity by showing that (a) each defendant violated a constitutional right, and (b) the right at issue was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 816, 172 L.Ed.2d 565 (2009). To be clearly established means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 107 S. Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Accordingly, qualified immunity shields from suit "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). [8]

**Villarreal** fails to satisfy her burden on either prong. This is not a case about a "citizen journalist just asking questions." That clever but misleading phrase cannot relieve this court of our obligation to evaluate **Villarreal's** conduct against the standards of Texas law. **Villarreal** was arrested on the defendants' reasonable belief, confirmed by a neutral magistrate, that probable cause existed based on her conduct in violation of a Texas criminal statute that had not been declared unconstitutional. We need not speculate whether section 39.06(c) allegedly violates the First Amendment as applied to citizen journalists who solicit and receive nonpublic information through unofficial channels. No controlling precedent gave the defendants fair notice that their conduct, or this statute, violates the Constitution facially or as applied to **Villarreal**. Each defendant [9] is entitled to qualified immunity from suit.

### 1. The Officials Reasonably Believed They Had Probable Cause

**\*5**  Probable cause to arrest "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338, 134 S. Ct. 1090, 1103, 188 L.Ed.2d 46 (2014). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13, 103 S. Ct. 2317, 2335 n.13, 76 L.Ed.2d 527 (1983). And in the qualified immunity context, "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L.Ed.2d 589 (1991)).

We begin with the text of the statute officers believed **Villarreal** violated. A person violates section 39.06(c) of the Texas Penal Code

> if, with intent to obtain a benefit ..., he solicits or receives from a public servant information that: (1) the public servant has access to by means of his office or employment; and (2) has not been made public. [10]

Section 39.06(d) defines "information that has not been made public" as "any information to which the public does not generally have access, and that is prohibited from disclosure under" the Texas Public Information Act ("TPIA"), TEX. GOV'T CODE §§ 552.001–.353.

The Texas Penal Code further defines a "benefit" as "anything reasonably regarded as economic gain or advantage, including benefit to any other person in whose welfare the beneficiary is interested." TEX. PENAL CODE § 1.07(a)(7).

The TPIA, expressly referenced in section 39.06(c), governs the overall availability of public records. [11] This Act, formerly known as the Open Records Act, states as its policy "that each person is entitled, unless otherwise expressly provided by law, at all times to complete information about the affairs of government." TEX. GOV'T CODE § 552.001. But to protect important governmental interests, and ensure that some categories of nonpublic information are not unwisely disclosed, the

TPIA lists various exceptions from required public disclosure. *Id.* §§ 552.101–.163. [12] Officials lack discretion to disclose some information. For example, "information considered to be confidential by law, either constitutional, statutory, or by judicial decision," is protected from disclosure. *Id.* § 552.101; *see also id.* § 552.007(a) (allowing voluntary disclosure "unless the disclosure is expressly prohibited by law or the information is confidential under law"). For a small subset of the categories of excepted information, improper disclosure may result in criminal penalties. *See* Tex. Att'y Gen. Op. ORD 676, 2002 WL 31827950, at *2 (2002) (citing TEX. GOV'T CODE §§ 552.007, 552.101, 552.352). Further, certain information pertinent to the detection, investigation, or prosecution of crime is excluded from disclosure. *See* TEX. GOV'T CODE § 552.108 (requiring the release of "basic information about an arrested person, an arrest, or a crime," but not other information if it would "interfere with the detention, investigation, or prosecution of crime").

**\*6** The Supreme Court of Texas has held that statutes like section 39.06 permissibly shield from public disclosure certain sensitive "information that has not been made public." *See Hous. Chron. Pub. Co. v. City of Houston*, 536 S.W.2d 559, 561 (Tex. 1976) (upholding provisions of the Texas Open Records Act, predecessor to the TPIA, that excepted certain police records from disclosure), *aff'g Hous. Chronicle Pub. Co. v. City of Houston*, 531 S.W.2d 177 (Tex. Civ. App.—Houston [14th Dist.] 1975).

The state has a longstanding policy to protect individual privacy in law enforcement situations that appear to involve suicide or vehicular accidents. In 1976, the Texas Attorney General authoritatively interpreted the Open Records Provision dealing with criminal investigation, and stated:

> We do not believe that this exception was intended to be read so narrowly that it only applies to those investigative records which in fact lead to prosecution. We believe that it was also intended to protect other valid interests such as ... insuring the privacy and safety of witnesses willing to cooperate with law enforcement officers.

Tex. Att'y Gen. Op. ORD 127 at 7 (1976); *see also Indus. Found. of the S. v. Tex. Indus. Accident Bd.*, 540 S.W.2d 668, 678–85 (Tex. 1976) (recognizing both a federal constitutional right and a separate common-law right to privacy); *id.* at 685 ("[I]nformation [is] deemed confidential by law if (1) the information contains highly intimate or embarrassing facts the publication of which would be highly objectionable to a reasonable person, and (2) the information is not of legitimate concern to the public.").

Recently, the Texas Attorney General has stated that under the Texas Constitution, "surviving family members can have a privacy interest in information relating to their deceased relatives." Tex. Att'y Gen. OR2022-36798, 2022 WL 17552725, at *2 (2022) (citing *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 168, 124 S. Ct. 1570, 1578 (2004)). This right extends at least until the government has notified the deceased's family. *See* Office of the Texas Attorney General, Public Information Act Handbook 76 & n.363 (2022), https://perma.cc/6NJB-X5NM (citing TEX. GOV'T CODE § 552.304). Thus, because Texas law protects the privacy of the bereaved family, the identity of a suicide or a deceased car accident victim may be considered confidential, especially when a law enforcement investigation has just begun or is ongoing.

Finally, Texas law prevents the disclosure of certain personal identifying information of victims in accident reports and exempts disclosure of information related to ongoing criminal investigations. *See* TEX. TRANSP. CODE § 550.065(f)(2)(A) (requiring the Texas Department of Transportation to withhold or redact "the first, middle, and last name of any person listed in a collision report"); TEX. GOV'T CODE § 552.108(a)(1)–(2) (exempting from disclosure information dealing with the investigation of a crime).

Moving from Texas law to the objective facts available to the defendant officers, there was abundant evidence for a reasonable belief that **Villarreal's** conduct matched the elements of a section 39.06(c) violation. Officer Ruiz attested in support of a warrant for misuse of official information that **Villarreal** "had received or solicited the name and condition of a traffic accident victim

and the name and identification of a suicide victim" from Officer Goodman while their deaths were under investigation. The affidavit also states that **Villarreal** gained popularity through her readership on Facebook. Officer Goodman was in possession of nonpublic information by virtue of her position but was not authorized to provide this information to **Villarreal**.

 **\*7**  **Villarreal** disputes none of these facts. Instead, **Villarreal** denies that she solicited and received the information with "intent to obtain a benefit," and she contends that the information was not "nonpublic." She also maintains that the warrants fail because the officers did not identify the specific TPIA or other exceptions on which they relied. We reject each contention. In her most extensive argument, which is dealt with in succeeding sections, **Villarreal** asserts that section 39.06 was "obviously unconstitutional" as applied to her conduct as a citizen-journalist.

*First*, **Villarreal** claims she could not "benefit" from soliciting information from Officer Goodman if she already knew the requested information from tips. In other words, soliciting and receiving information that she already knew, even though she could not confirm its accuracy, cannot be a prohibited benefit. But Texas law defines "benefit" broadly as "anything reasonably regarded as economic gain or advantage." TEX. PENAL CODE § 1.07(a)(7). Scorning to await an official LPD report, and ignoring other TPIA open records procedures, **Villarreal** secretly solicited information from Officer Goodman to bolster her first-to-report reputation. Her reputation is integral to her local fame and success as a journalist. After all, if she did not confirm the name and condition of a traffic accident victim or suicide victim from a back-channel police source, **Villarreal** would face a choice: (a) report the raw witness information and run the risk of grotesque error, or (b) take time to go through local or TPIA channels and sacrifice the status of getting a scoop.

**Villarreal's** federal complaint, in any event, readily admits the "benefits" of her journalistic style. She boasts over one hundred thousand Facebook followers and a well-cultivated reputation, which has engendered publicity in the *New York Times*, free meals "from appreciative readers," "fees for promoting a local business," and "donations for new equipment necessary to her citizen journalism efforts." **Villarreal** pleads that she "does not generate regular revenue or other regular economic gain from her citizen journalism." That bald assertion, however, does not contradict the pleadings showing she benefited from receiving the nonpublic information solicited through a backchannel.

Further, at the time of her arrest, no Texas court had construed the meaning of "with intent to obtain a benefit" as used in section 39.06(c) to exclude the perks available to citizen journalists. Her effort at statutory construction hardly shows the law was so clearly established that "every reasonable [law enforcement officer] would have understood" the statute could not apply to **Villarreal**. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5, 142 S. Ct. 4, 7, 211 L.Ed.2d 164 (2021).

*Second*, **Villarreal** maintains that information already known to her cannot be nonpublic. More precisely, her complaint alleges that, because she initially received information from two non-government witnesses, that information was "generally accessible by the public." She also asserts that Officer Goodman simply corroborated the information she had independently ascertained. But whether information is nonpublic is determined by the terms of the statute. There is no "corroboration" exclusion to the provision. What matters under section 39.06 is whether the information qualifies for a TPIA exception or is prohibited from disclosure under the Texas Constitution, a statute, or a judicial decision. As Chief Judge Richman explained in her panel dissent,

> [u]nder **Villar[r]eal's** reading of the statute, information would rarely if ever be nonpublic because in virtually every scenario, a person who is not a "public servant" would have some knowledge of the event or incident. The fact that there are witnesses to a crime, for example, does not mean that information the witnesses have or may have related to other individuals is publicly accessible. Information individual witnesses have is not commonly thought of as generally accessible to the public.

 **\*8**  *Villarreal*, 44 F.4th at 388 (Richman, C.J., dissenting). That a private third-party knows some information does not change whether the information is nonpublic under the statute.

Further undermining this (unconvincing) interpretation of the statute, **Villarreal** never alleges that any defendant actually knew "that she had obtained the identities of the victims before she approached her backchannel source." *Id.* at 387. But if the officers did not know she had obtained information first from non-government sources, then they could not have been unreasonable in inferring that she obtained the information illegally from Officer Goodman.

*Third*, **Villarreal** contends that probable cause was defeated because the affidavits fail to identify a specific TPIA exception. But an arrest warrant affidavit is not required to paraphrase the elements of the law the defendant allegedly violated. *See Adams v. Williams*, 407 U.S. 143, 149, 92 S. Ct. 1921, 1924, 32 L.Ed.2d 612 (1972) ("Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."). The whole point of a probable cause affidavit is to present relevant "facts and circumstances" so that a *judge* can independently determine the legal question —whether probable cause exists that a law was violated. *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992). The judge looks to the "totality of the circumstances" and decides "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer," demonstrate "a probability or substantial chance of criminal activity." *District of Columbia v. Wesby*, 583 U.S. 48, 56–57, 138 S. Ct. 577, 586, 199 L.Ed.2d 453 (2018) (quotations and citations omitted).

Here, the affidavits clearly and expressly allege that **Villarreal** sought and obtained nonpublic information from an unofficial source in violation of section 39.06(c). They describe the information, the benefit obtained, and the circumstances surrounding how she used an illicit backchannel to obtain the nonpublic information. In reporting the identity of victims, the employer of one victim, and the victims' possible causes of death while those matters remained under investigation, the conduct alleged in the affidavits sufficed to establish probable cause. [13] We reiterate: probable cause is a "practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370, 124 S. Ct. 795, 799, 157 L.Ed.2d 769 (2003) (internal citations and quotations omitted). It turns "on the assessment of probabilities in particular factual context—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 371, 124 S. Ct. at 800 (internal citation omitted).

It is not this court's task to say whether **Villarreal** would have been convicted under the statute. But applicable state law confirms that all of the officers involved here reasonably believed they had probable cause to seek her arrest. [14]

### 2. No "Obvious Unconstitutionality"

**\*9** The crux of **Villarreal's** argument is that even if probable cause existed, she was unlawfully arrested because as applied to her, section 39.06(c) "obviously" violates the First Amendment. The panel majority initially agreed with her, but on rehearing, it retreated from proclaiming section 39.06(c) "obviously" unconstitutional. *See **Villarreal***, 44 F.4th at 384 (5th Cir. 2022) (opinion on rehearing) ("On its face, Texas Penal Code § 39.06(c) is not one of those 'obviously unconstitutional' statutes."). As that turnabout suggests, **Villarreal's** contention fails to surpass three high hurdles. First, no final decision of a state court had held the law unconstitutional at the time of the arrest. Thus, even if the law were ultimately held to violate the First Amendment as applied to **Villarreal's** conduct, probable cause would continue to shield the officers from liability. Second, the Supreme Court and lower courts have not relevantly defined the contours of an "obviously unconstitutional" statute. Third, the independent intermediary rule affords qualified immunity to the officers because a neutral magistrate issued the warrants for **Villarreal's** arrest.

#### a. *Enacted Statutes Are Presumptively Constitutional*

Courts do not charge officers with predicting the constitutionality of statutes because the Fourth Amendment's benchmark is reasonableness. *Heien*, 574 U.S. at 60, 135 S. Ct. at 536. Accordingly, the law affords officers "fair leeway" to make reasonable mistakes of law and fact. *Id.* at 61, 135 S. Ct. at 536 (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S. Ct. 1302, 1311, 93 L.Ed. 1879 (1949)). In the end, "[w]hether the facts turn out to be not what was thought, or the law turns out to be not

what was thought, the result is the same: The facts are outside the scope of the law." *Id.* Thus, when a grand jury fails to indict, or charges are later dismissed, officers cannot be held liable solely for arrests made reasonably but without probable cause. [15] Whether section 39.06 ultimately violates First Amendment principles as applied here, "the officers' assumption that the law was valid was reasonable." *Id.* at 64, 135 S. Ct. at 538. [16]

This principle defeats **Villarreal's** contention. At the time of **Villarreal's** arrest, no final decision of a state court had held section 39.06(c) unconstitutional. When **Villarreal** petitioned for a writ of habeas corpus after posting bail, the Texas district court orally granted the writ and ruled section 39.06 unconstitutionally vague. But that decision is irrelevant. First, courts only take account of what notice officers had at the time of arrest. As just noted, police officers are not "expected to predict the future course of constitutional law." *Wilson v. Layne*, 526 U.S. 603, 617, 119 S. Ct. 1692, 1701, 143 L.Ed.2d 818 (1999) (quoting *Procunier v. Navarette*, 434 U.S. 555, 562, 98 S. Ct. 855, 860, 55 L.Ed.2d 24 (1978)). Second, the state habeas court declined to apply section 39.06 to **Villarreal** *not* because its application violated the First Amendment, but because the law was unconstitutionally *vague.* (**Villarreal** does not contend the statute is unconstitutionally vague.)

Prior to **Villarreal's** arrest, one Texas intermediate appellate court explicitly left open the question of this statute's vagueness, while distancing itself from the trial court's holding of unconstitutionality. *State v. Newton*, 179 S.W.3d 104, 111 (Tex. App.—San Antonio 2005) ("[W]e do not address the remaining issues raised on appeal, including the constitutionality of § 39.06(c) and (d) of the Penal Code."). [17] Moreover, *Newton* was a companion case to another prosecution initiated under section 39.06(c). *See State v. Ford*, 179 S.W.3d 117, 125 (Tex. App.—San Antonio 2005) (dismissing indictment because the TPIA does not apply to judicial information); *see also Matter of J.B.K.*, 931 S.W.2d 581, 584 (Tex. App.—El Paso 1996) (referring to a potential violation of section 39.06(c) in an attorney discipline proceeding). Several other prosecutions have been brought under the companion section 39.06(b), which prohibits a public servant from disclosing nonpublic information. *See Patel v. Trevino*, No. 01-20-00445-CV, 2022 WL 3720135 (Tex. App.—Houston Aug. 30, 2022); *Tidwell v. State*, No. 08-1100322-CR, 2013 WL 6405498 (Tex. App.—El Paso Dec. 4, 2013); *Reyna v. State*, No. 13-02-499-CR, 2006 WL 20772 (Tex. App.—Corpus Christi Jan. 5, 2006). These cases reinforce that the officers had no need to predict the future exegesis of a presumptively constitutional law.

b. *Section 39.06(c) Is Not Grossly and Flagrantly Unconstitutional as Applied*

 **\*10**  **Villarreal** characterizes her First Amendment claims as invoking her rights "to peaceably ask officials questions and to engage in routine newsgathering and reporting." These rights, she asserts, are "obvious to every reasonable official." If probable cause turned on a defendant's self-serving rationales for her conduct, very little law enforcement could take place. But under existing caselaw, officers are almost always entitled to qualified immunity when enforcing even an unconstitutional law, so long as they have probable cause. *Michigan v. DeFillippo*, 443 U.S. 31, 38, 99 S. Ct. 2627, 2632, 61 L.Ed.2d 343 (1979). *DeFillippo* explained the rule and a *possible* exception for "a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *Id.* (emphasis added). [18] The Court in *Heien* paraphrased this language when summarizing *DeFillippo. See Heien*, 574 U.S. at 64, 135 S. Ct. at 538 ("Acknowledging that the outcome might have been different had the ordinance been 'grossly and flagrantly unconstitutional,' we concluded that under the circumstances, 'there was abundant probable cause to satisfy the constitutional prerequisite for an arrest.' " (quoting *DeFillippo*, 443 U.S. at 37–38, 99 S. Ct. at 2632)). [19] Both *DeFillippo* and *Heien* note no more than a *possible* exception—which the Supreme Court has not further developed in the forty-three years since *DeFillippo* was decided. Although a few circuit court decisions before and after *DeFillippo* have rested on the idea of "obvious unconstitutionality," none is apposite here, and this case presents no occasion to deviate from the broad proposition that "[t]he enactment of a law forecloses speculation by enforcement officers concerning its constitutionality." *DeFillippo*, 443 U.S. at 38, 99 S. Ct. at 2632. [20]

**Villarreal** analogizes her conduct to that in *Sause v. Bauer*, in which, she alleges, the Supreme Court held it is "obvious" that the right to pray is protected by the First Amendment, and that an arrest of someone praying was an obvious constitutional violation. She misconstrues *Sause.* The Supreme Court reversed and remanded for further proceedings because there were not enough

facts to determine whether "circumstances [existed] in which a police officer may lawfully prevent a person from praying at a particular time and place." *Sause*, 138 S. Ct. at 2562.

> For example, if an officer places a suspect under arrest and orders the suspect to enter a police vehicle for transportation to jail, the suspect does not have a right to delay that trip by insisting on first engaging in conduct that, at another time, would be protected by the First Amendment.

*Id.* at 2562–63. *Sause* made no holding that the "obvious" violation exception applies broadly to arrests that may impinge on First Amendment rights; indeed, the court's hypothetical example suggests the opposite proposition.

Closer on point is *DeFillippo*, where the Court upheld an officer's arrest of a suspect for failing to identify himself in violation of Michigan law, even though a state court later held that law unconstitutionally vague. *DeFillippo*, 443 U.S. at 34–35, 99 S. Ct. at 2631 (noting that DeFillippo was ultimately charged with possession of a controlled substance). The law on its face raised an issue of compelled speech in violation of the First Amendment. Yet at the time of DeFillippo's arrest, "there was no controlling precedent that this statute was or was not constitutional, and hence the conduct violated a presumptively valid ordinance." *Id.* at 37, 99 S. Ct. at 2632. Even if ==Villarreal's== arrest implicated her First Amendment rights, this case is substantially similar to *DeFillippo* because there was certainly no "obvious" constitutional violation.

 **\*11**  If more were needed, in *Vives v. City of New York*, 405 F.3d 115, 116–17 (2d Cir. 2004), the court held that officers were entitled to qualified immunity for arresting a defendant under an "aggravated harassment" statute on account of his harassing letter to a candidate for state office. The statute had never before been declared unconstitutional, and state courts had declined to find it unconstitutional. Consequently, the statute was far from being "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *Id.* at 117 (quoting *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 103 (2d Cir. 2003)).

Because ==Villarreal's== conduct fell within the elements of a violation of section 39.06(c), a statute that is not "grossly and flagrantly unconstitutional," the officials could rely on the presumptively valid law.

### c. *The Independent Intermediary Rule Shields the Officers*

The third basis for sustaining the Appellees' qualified immunity is that a neutral magistrate issued the warrants for ==Villarreal's== arrest. A warrant secured from a judicial officer typically insulates law enforcement personnel who rely on it. *See Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir. 1988); *see also Buehler v. City of Austin/Austin Police Dep't*, 824 F.3d 548, 553–54 (5th Cir. 2016) (applying independent intermediary doctrine to false arrest claims under First and Fourth Amendment). ==Villarreal== argues her claim can be shoehorned into the independent intermediary rule's single, narrow exception, which arises "when 'it is obvious that *no* reasonably competent officer would have concluded that a warrant should issue.' " *Messerschmidt v. Millender*, 565 U.S. 535, 547, 132 S. Ct. 1235, 1245, 182 L.Ed.2d 47 (2012) (emphasis added) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). Further, the magistrate's mistake in issuing the arrest warrant must be "not just a reasonable mistake, but an unacceptable error indicating gross incompetence or neglect of duty." *Malley*, 475 U.S. at 346 n.9, 106 S. Ct. at 1098 n.9.

That is a high bar. The Supreme Court puts such weight on a magistrate's determination because

> [i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the

ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.

*United States v. Leon*, 468 U.S. 897, 921, 104 S. Ct. 3405, 3419, 82 L.Ed.2d 677 (1984). "It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination." *Malley*, 475 U.S. at 346 n.9, 106 S. Ct. at 1098 n.9.

It cannot be said *no* reasonable officer would think warrants should have issued here. The warrant affidavits were not mere "barebones" affidavits without any factual support. *Spencer v. Staton*, 489 F.3d 658, 661 (5th Cir. 2007), *modified on other grounds on reh'g*, 489 F.3d 666 (5th Cir. 2007). Nor has **Villarreal** alleged anything beyond conclusional assertions that defendants tainted the intermediary's decision-making process by "maliciously withh[olding] relevant information or otherwise misdirect[ing] the intermediary." *Shaw v. Villanueva*, 918 F.3d 414, 417 (5th Cir. 2019). Each arrest warrant affidavit is eight pages long and each one quotes conversations between **Villarreal** and Officer Goodman about information not yet made public and later posted on **Villarreal's** Facebook page to the benefit of her journalism activity. **Villarreal's** conduct more than arguably matches what is forbidden by the text of section 39.06(c).

 **\*12** The reasoning of *DeFillippo* and *Heien* concerning mistakes of law is also relevant to the independent intermediary rule. Suppose the officers were unsure whether section 39.06(c) applied to **Villarreal**. They had every right to rely on the legal experience of the District Attorney and neutral magistrate judge. It is one thing to hold the DA, assistant DA, and the officers responsible under *Malley* and its progeny for known mistakes of fact (although **Villarreal** identifies no specific factual mistakes in the warrant affidavits). It is entirely different and unreasonable to say the officers' reliance on a neutral magistrate's application of the law is outside the boundary of reasonableness for qualified immunity.[21] To hold otherwise, as Chief Judge Richman's dissent urged, would "shred[ ] the independent intermediary doctrine." *Villarreal*, 44 F.4th at 380 (opinion on rehearing).

\* \* \*

Probable cause existed to arrest **Villarreal** for allegedly violating a presumptively valid Texas law that had not previously been overturned. On its face, the law was not grossly and flagrantly unconstitutional, and the arrest warrants were approved by a neutral magistrate. Since there was no Fourth Amendment violation, the officers have qualified immunity on these grounds alone from **Villarreal's** First Amendment claims.

## B. NO CLEARLY ESTABLISHED RIGHT

Nonetheless, because **Villarreal** rests her case on the "obviousness" of her First Amendment rights to "ask questions of a government official" and "pursue her work as a journalist," we proceed to the second step of the qualified immunity analysis and consider whether the asserted constitutional rights were "clearly established" at the time of the alleged violation. Thus, even if the arrests were constitutionally infirm, the officers are entitled to qualified immunity unless **Villarreal** can identify binding precedent that "placed the statutory or constitutional question beyond debate," so that "every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas*, 595 U.S. at 5, 142 S. Ct. at 7–8 (internal quotations and citations omitted). "That is because qualified immunity is inappropriate only where the officer had fair notice—in light of the specific context of the case, not as a broad general proposition—that his *particular* conduct was unlawful." *Craig v. Martin*, 49 F.4th 404, 417 (5th Cir. 2022) (internal quotation marks and citation omitted). In other words, "police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 584 U.S. ——, 138 S. Ct. 1148, 1153, 200 L.Ed.2d 449 (2018) (per curiam) (internal quotation marks and citation omitted).

**Villarreal** cites no case, nor are we aware of one, where the Supreme Court, or any other court, has held that it is unconstitutional to arrest a person, even a journalist, upon probable cause for violating a statute that prohibits solicitation and receipt of nonpublic

information from the government for personal benefit. Under the normal standards of qualified immunity, no "clearly established law" placed the officers on notice of **Villarreal's** First Amendment right not to be arrested. **Villarreal**, however, relies on Eighth Amendment cases where the Supreme Court denied qualified immunity for deliberate indifference to unconstitutional prison conditions and declined to scrutinize the cases fact-specifically. *See Hope v. Pelzer*, 536 U.S. 730, 738–39, 122 S. Ct. 2508, 2514–15, 153 L.Ed.2d 666 (2002) ("[T]he risk of harm [to the prisoners] is obvious."); *Taylor v. Riojas*, 592 U.S. 7, 141 S. Ct. 52, 54, 208 L.Ed.2d 164 (2020)(per curiam) ("Confronted with the particularly egregious facts of this case, any reasonable officer should have realized that Taylor's conditions of confinement offended the Constitution.") (footnote omitted)); *McCoy v. Alamu*, —— U.S. ——, 141 S. Ct. 1364, 209 L.Ed.2d 114 (2021) (instructing the court to reconsider an Eighth Amendment case "in light of *Taylor*").

 *13 *Hope* and its progeny express a general, but decidedly narrow, obviousness exception to the requirement that "clearly established law" be founded on materially identical facts. In any event, those cases are inappropriate templates for describing "clearly established" law in this context. In *Morgan v. Swanson*, 659 F.3d 359, 373 (5th Cir. 2011) (en banc), a case involving First Amendment free exercise rights, this court noted that *Hope* does not stand for the broad proposition that plaintiffs need not offer any similar cases to prove that an officer should have been on notice that his conduct violated the Constitution. *Hope* does not excuse plaintiffs from proving that every reasonable official would know the conduct at issue violates the Constitution. And *Sause*, if anything, also strongly implies that an individual's claimed First Amendment rights must be closely analyzed when the question involves probable cause for an arrest, or an officer's qualified immunity. 138 S. Ct. at 2562–63.

Consequently, we adhere to the general rule that for an asserted right to be clearly established for purposes of qualified immunity, it must "have a sufficiently clear foundation in then-existing precedent" that it is "settled law." *Wesby*, 583 U.S. at 63, 138 S. Ct. at 589 (citation omitted). "The precedent must be clear enough that *every* reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.*, 138 S. Ct. at 590 (emphasis added). The law is not clearly established if referenced cases are "materially distinguishable and thus do[ ] not govern the facts of this case." *Rivas-Villegas*, 595 U.S. at 6, 142 S. Ct. at 8.

**Villarreal** identifies a general First Amendment principle—that a third party may publish sensitive government information already in the public domain—as evidence that the officer defendants violated clearly established law by arresting her with a warrant upon probable cause for violating section 39.06. But the alleged unlawfulness of the defendants' conduct here "does not follow immediately," or even secondarily, from the cases **Villarreal** cites. *Wesby*, 583 U.S. at 64, 138 S. Ct. at 590 (quoting *Creighton*, 483 U.S. at 641, 107 S. Ct. at 3039).

The principal cases **Villarreal** relies on involve *publication* of certain information already in the public domain. *See N.Y. Times Co. v. United States*, 403 U.S. 713, 714, 91 S. Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (per curiam) (vacating an injunction against publishing the Pentagon Papers, a classified study of United States involvement in Vietnam, without illegal action by the press); *Fla. Star v. B.J.F.*, 491 U.S. 524, 538, 109 S. Ct. 2603, 2611, 105 L.Ed.2d 443 (1989) (stating that, when the government inadvertently places an incident report *in the pressroom*, "it is clear ... that the imposition of damages against the press for its subsequent publication can hardly be said to be a narrowly tailored means of safeguarding anonymity"). A right to *publish* information that is no longer within the government's control is different from what **Villarreal** did: she *solicited and received nonpublic* information from a public official for personal gain.

Moreover, **Villarreal** correctly asserts that journalists have an undoubted right to gather news "from any source by means within the law," but "[i]t has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes*, 408 U.S. 665, 681–82, 684, 92 S. Ct. 2646, 2657–58, 33 L.Ed.2d 626 (1972) (citing cases); *see also Houchins v. KQED, Inc.*, 438 U.S. 1, 15, 98 S. Ct. 2588, 2597, 57 L.Ed.2d 553 (1978) (plurality opinion) ("Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control."). "Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded, and they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an

impartial tribunal." *Branzburg*, 408 U.S. at 684–85, 92 S. Ct. at 2658. Further, "[t]he Court has emphasized that '(t)he publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.' " *Id.* at 683, 92 S. Ct. at 2657 (quoting *Associated Press v. NLRB*, 301 U.S. 103, 132–33, 57 S. Ct. 650, 656, 81 L.Ed. 953 (1937)). And the Court has been unequivocal that there is no journalist privilege or immunity from prosecution under generally applicable law. Nor is a journalist "free to publish with impunity everything and anything [he] desires to publish." *Id.*, 92 S. Ct. at 2658 (citing cases). **Villarreal's** First Amendment rights as a citizen journalist are therefore based on news gathering by "means within the law." Far from supporting the "obviousness" of her claims, these authorities require further careful analysis before any constitutional violation can be ascribed to her arrest.

 **\*14**  The First Amendment also does not prevent the elected political branches from protecting "nonpublic" information. *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 40, 120 S. Ct. 483, 489, 145 L.Ed.2d 451 (1999) ("[W]hat we have before us is nothing more than a governmental denial of access to information in its possession. California could decide not to give out arrestee information at all without violating the First Amendment."). The State of Texas chose to protect certain information from immediate disclosure in order to ensure that the government can function. If citizens possessed some overarching constitutional right to obtain information from the government, laws like the TPIA and the Freedom of Information Act would be superfluous. We do not presume the Texas legislature or Congress performed meaningless acts in protecting public access to information that was already required to be in the public domain under the First Amendment. To the contrary, "[t]he Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act." *Houchins*, 438 U.S. at 14, 98 S. Ct. at 2596 (plurality opinion). [22]  Whatever the outcome of particular challenges to denials of access to nonpublic information, **Villarreal** cannot sustain the proposition that Texas "obviously" had no authority to outlaw disclosure (at least temporarily, e.g., pending notification of next of kin) of the information she sought or to prohibit her from soliciting unlawful disclosure for her benefit.

An addendum to **Villarreal's** position is her claim that the First Amendment "right to petition for a redress of grievances" was "obviously" violated by her arrest. "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388, 131 S. Ct. 2488, 2495, 180 L.Ed.2d 408 (2011). The Petition Clause is plainly not relevant to establish the right she promotes. Soliciting nonpublic information for personal benefit is neither an act of "petition" nor "for a redress of grievances."

No case would have given these officers "fair notice" that their conduct in arresting **Villarreal** would run afoul of the First Amendment. Consequently, she has not met her burden on the second prong of the qualified immunity standard. *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L.Ed.2d 583 (2004).

### C. ADDITIONAL CLAIMS

Each defendant is entitled to qualified immunity on **Villarreal's** remaining claims because she fails to allege any plausible constitutional violations.

#### 1. First Amendment Retaliation

**Villarreal** fails to state a First Amendment retaliation claim. "The First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). To establish such a claim against the defendants, **Villarreal**

must show that (1) [she] w[as] engaged in constitutionally protected activity, (2) the defendants' actions caused [her] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against [her] exercise of constitutionally protected conduct.

*Id.* (citations omitted).

**Villarreal** fails to adequately plead a First Amendment retaliation claim because the officers had probable cause under section 39.06, and she does not allege that defendants curtailed her exercise of free speech. Nor does **Villarreal** have an actionable retaliatory investigation claim, because this court does not recognize such a claim. *See Colson v. Grohman*, 174 F.3d 498, 512 (5th Cir. 1999) (holding that "criticism, an investigation (or an attempt to start one), and false accusations" are "all harms that ... are not actionable under our First Amendment retaliation jurisprudence").

Further, the Supreme Court maintains that probable cause "generally defeat[s] a First Amendment retaliatory arrest claim." *Nieves v. Bartlett*, 587 U.S. ——, 139 S. Ct. 1715, 1726, 204 L.Ed.2d 1 (2019). The Court articulated a narrow exception "where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 1727. To benefit from this exception, **Villarreal** must "present[ ] objective evidence that [s]he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* **Villarreal** does not offer evidence of other similarly situated individuals who engaged in the same conduct in violation of section 39.06(c) yet were not arrested.

 **\*15** Judge Higginson suggests the *Nieves* exception has been met here because, allegedly, no one has ever been prosecuted for violating section 39.06(c). There have been prosecutions under other related statutory sections, of course. By the same token, Judge Higginson's analysis does not identify "similarly situated individuals" who solicited or received nonpublic information to obtain a benefit but were not prosecuted; he merely assumes the conclusion. But more to the point, plaintiff offered no evidence of similarly situated individuals, perhaps because others are not in the habit of obtaining backchannel information about ongoing criminal investigations, like **Villarreal**.

2. Fourteenth Amendment Selective Enforcement

**Villarreal's** Fourteenth Amendment selective enforcement claim likewise required her to identify "examples" of similarly situated individuals who were nonetheless treated differently. *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 514 (5th Cir. 2021). " 'Similarly situated' means 'in all relevant respects alike.' " *Golden Glow Tanning Salon, Inc. v. City of Columbus*, 52 F.4th 974, 978 (5th Cir. 2022) (quoting *Tex. Ent. Ass'n*, 10 F.4th at 513). **Villarreal** did not provide even one example of an individual similarly situated to her in all relevant respects who was not arrested for his conduct. This claim fails.

3. Conspiracy

Last, **Villarreal** cannot maintain a § 1983 conspiracy claim because each officer is immune from suit. "To support a conspiracy claim under § 1983, the plaintiff must allege facts that suggest 'an agreement between the ... defendants to commit an illegal act' and 'an actual deprivation of constitutional rights.' " *Terwilliger v. Reyna*, 4 F.4th 270, 285 (5th Cir. 2021) (quoting *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994)). If all the "acts fall under qualified immunity, there can be no § 1983 conspiracy claim." *Mowbray v. Cameron County*, 274 F.3d 269, 279 (5th Cir. 2001). The conspiracy claim was correctly dismissed.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.

James E. Graves, Jr., Circuit Judge, joined by Elrod, Higginson, Willett, Ho, and Douglas, Circuit Judges, dissenting:
I agree with the persuasive opinions from my dissenting colleagues. I agree with Judge Higginson that the majority errs by failing to credit **Villarreal's** allegations as true; with Judge Willett that qualified immunity is not appropriate here, where no official was compelled to make a "split-second judgment"; and with Judge Ho that, among other things, the majority opinion will permit government officials to retaliate against speech while hiding behind cherry-picked state statutes.

As Judge Ho notes, the majority is also wrong to disparage **Villarreal** for, as it writes, "capitaliz[ing] on others' tragedies to propel her reputation and career." *Ante* at 2, 98 S. Ct. 2588, 2597. Not only is that characterization of **Villarreal's** enterprise unfair—as the majority writes, her journalistic endeavor survives off the solicitude of fans and "occasional" advertising, *id.* at 3, 98 S. Ct. 2588, 2597—but it insinuates that **Villarreal's** First Amendment rights are somehow diminished because she makes a modest living while exercising them.

I write separately to emphasize the importance of gathering and reporting news. **Villarreal** is a journalist.[1] A journalist is someone who, on a professional or even semi-professional basis, acts as an agent for the people, representing what the Supreme Court has called the "public interest, secured by the Constitution, in the dissemination of truth," *The Fla. Star v. B.J.F.*, 491 U.S. 524, 533, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989). The right to gather and report news could not be more firmly embedded in the Constitution. The text of the First Amendment itself forbids the government from "abridging the freedom ... of the press." U.S. CONST. amend. I.

**\*16** There is simply no way such freedom can meaningfully exist unless journalists are allowed to seek non-public information from the government. Today's majority opinion overlooks that protection all too cavalierly. But in fact, the right to "newsgathering" has long been protected in American jurisprudence. *See Branzburg v. Hayes*, 408 U.S. 665, 681, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated."). The Supreme Court has made clear that the First Amendment protects the publication of information obtained via "routine newspaper reporting techniques"—which include asking for the name of a crime victim from government workers not clearly authorized to share such information. *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 99, 103-04, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979).

The majority at times conflates that right with the government's prerogative to "guard against the dissemination of private facts." *Fla. Star*, 491 U.S. at 534, 109 S.Ct. 2603. But those two principles are not mutually exclusive—the government's power to protect certain information has little to do with a person's right to ask for it. This case does not concern the rights of the officer who furnished **Villarreal** with information, or what means a local government may use to prevent employees from exposing sensitive information. It concerns only the rights of a third party who did nothing more than ask.

Moreover, the Supreme Court has held that restraints on the *publication* of lawfully obtained, truthful information are only allowed when they further "a state interest of the highest order." *Fla. Star*, 491 U.S. at 541, 109 S.Ct. 2603. And the Court has already explained that preserving the anonymity of a juvenile offender did not meet that standard—so it seems unlikely that preserving the anonymity of automobile accident victims, or victims of suicide, as in this case, would fare any better. *Smith*, 443 U.S. at 104, 99 S.Ct. 2667. Nor did anything make it unlawful for **Villarreal** to obtain that information, except for the law that she now argues is unconstitutional.

While I agree with Judge Ho that the enforcement of Texas Penal Code § 39.06(c) against **Villarreal** was obviously unconstitutional in light of the broad right of each person to ask questions of the government, it is also obviously unconstitutional

in light of the related and equally well-established right of journalists to engage in routine newsgathering. That right, arising out of the plain language of the Constitution, acknowledges that journalists play a special role in our society as agents of the people. They are individuals who take on a civic and professional responsibility to keep the public informed, and thereby provide a crucial check on the power of the government. That is not to say that press possess any right of access to information that is unavailable to the general public, *see Branzburg*, 408 U.S. at 684, 92 S.Ct. 2646—only that, more often than not, it is the press to which we delegate the responsibility of asking for that information.

Today's decision has profound practical implications. As amici note, American society has often benefitted when journalists have acquired non-public information from unofficial sources. Americans only learned about the horrific My Lai Massacre, during the Vietnam War, because a journalist asked a backchannel Pentagon source about it.[2] Many years later, that same journalist reported details of prisoner abuse at the Abu Ghraib prison after gleaning them from a non-public military report.[3] Confidential sources have also played an important role in exposing police abuses.[4] And in one particularly noteworthy example, an unauthorized source provided a classified study on war policy to American news outlets—and the ensuing legal case made it to the Supreme Court, which rejected efforts to suppress the study's publication. *See New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

**\*17** But now, the majority would limit journalists who work the government beat to publicly disclosed documents and official press conferences, meaning they will only be able to report information the government chooses to share. That outcome is unfortunate, unfair, and unconstitutional. It is unfortunate because a democracy functions properly only when the citizenry is informed. It is unfair because it restricts the journalistic freedom to gather information. And it is unconstitutional, for "[a] free press cannot be made to rely solely upon the sufferance of government to supply it with information." *Smith*, 443 U.S. at 104, 99 S.Ct. 2667. Indeed, it is not even clear whether the majority's opinion would allow journalists to request information in good faith from official channels without fear of reprisal.

I respectfully dissent.

Stephen A. Higginson, Circuit Judge, joined by Elrod, Graves, Willett, Ho, Oldham, and Douglas, Circuit Judges, dissenting: Few constitutional progenitors are more celebrated by our Founding Fathers than Thomas Paine, the citizen-journalist who published *Common Sense*, the pro-independence pamphlet that historian Gordon Wood describes as "the most incendiary and popular pamphlet of the entire revolutionary era." Gordon S. Wood, THE AMERICAN REVOLUTION: A HISTORY 55 (Modern Library, 2002). To safeguard both the text of the Constitution, as well as the values and history that it reflects, the Supreme Court guarantees the First Amendment right of engaged citizen-journalists, like Paine, to interrogate the government. Judge Ho forcefully describes the obviousness of that guarantee, and I am confident all judges share the late Judge Silberman's similar, cautionary sentiment "that the most heinous act in which a democratic government can engage is to use its law enforcement machinery for political ends."[1]

**Priscilla Villarreal** alleges that law enforcement officials in Laredo, Texas did precisely this: They arrested her because her newsgathering and reporting activities annoyed them. To silence her as a critic and gadfly, she claims, they arrested her.

**Villarreal** is entitled to have the district court resolve her plausible allegation that the government officers who arrested her lacked probable cause, and misled the magistrate whose warrants they now claim should insulate them from liability for their unconstitutional actions. And even if these officers had probable cause to arrest her, the Supreme Court in *Nieves v. Bartlett*, —— U.S. ——, 139 S.Ct. 1715, 204 L.Ed.2d 1 (2019) has instructed courts on how to respond when an individual brings a complaint against the government for First Amendment retaliation. Because that instruction was not applied, I would vacate and remand.

**I. Villarreal alleges that her arresting officers lacked probable cause and misled the magistrate who issued her arrest warrants.**

Even if the majority is correct that **Villarreal** is obliged to plead no probable cause as to a crime that does not exist, *see Trevino v. Iden*, 79 F.4th 524, 531 (5th Cir. 2023), she did. In the light most favorable to her, her allegation is that Defendant Ruiz, supervised and directed by the other named Defendants, tainted evidence to mislead and obtain warrants to arrest and silence her:

90. Ruiz knew or should have known that the Statute required a showing that the information at issue not be generally available to the public and that it be excepted from disclosure under the TPIA. And Ruiz knew or should have known that the information **Villarreal** published was not subject to a TPIA exception and was generally accessible to the public. But Ruiz failed to mention or discuss these essential elements of the Statute in the Arrest Warrant Affidavits. He also failed to disclose that the information **Villarreal** received or published was generally accessible to the public and not subject to a TPIA exception. On information and belief, Ruiz's misrepresentations and omissions were deliberate.

**\*18** ...

92. Ruiz also knew or should have known that the Statute required a showing that **Villarreal** intended to enjoy an economic advantage or gain from the request for or receipt of the information in the Targeted Publications. But Ruiz failed to recite this essential element of the Statute in the Arrest Warrant Affidavits, and failed to state how or why **Villarreal** intended to enjoy an economic gain or advantage from the information. Ruiz alleged only that **Villarreal's** release of the information before other news outlets gained her popularity in Facebook. On information and belief, Ruiz's misrepresentations and omissions were deliberate.

93. Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants were aware or should have been aware that at all times leading up to **Villarreal's** arrest, **Villarreal** did not use her Facebook page as a means of economic gain.

94. Ruiz's statements in the Arrest Warrant Affidavits did not address **Villarreal's** intent or knowledge in receiving or using the information, despite this being required by the statute. The affidavits also did not address whether **Villarreal** knew she was asking for or receiving non-publicly accessible information from an official source. On information and belief, Ruiz's omissions were deliberate.

95. Two warrants for **Villarreal's** arrest—for each of the Targeted Publications—were issued on December 5, 2017 ("Arrest Warrants"). The Arrest Warrant issued as a result of the knowing or reckless misrepresentations and omissions of key elements and facts Arrest Warrant Affidavits.

...

165. Lacking a valid basis to arrest **Villarreal**, Defendants Alaniz, Jacaman, Treviño, Ruiz, DV, and the Doe Defendants (a) knowingly manufactured allegations under a pretextual application of Texas Penal Code § 39.06, upon which no reasonable official would have relied under the circumstances; (b) knowingly prepared and obtained a warrant for **Villarreal's** arrest under false pretenses; and (c) knowingly arrested and detained her and/or caused her arrest and detention without probable cause and against her will, based on a knowing or deliberately indifferent wrongful application of TEXAS PENAL CODE § 39.06.

This extensive allegation is detailed. It is a plausible allegation that law enforcement knew, but did not disclose to the court they approached for the authority to arrest **Villarreal**, that she had sought *no* benefit from her sourcing, and that she had obtained *no* non-public information. It is an allegation that exculpatory facts were obscured by the Defendants in their affidavits so that they could mislead a magistrate to confirm probable cause for them to arrest **Villarreal**.

Despite this specific allegation of law enforcement "misrepresentations and omissions"—and despite significant reiteration of this allegation in the motion to dismiss hearing—the district court failed to address, much less credit, the contention that

Defendants misled the magistrate whom they now offer, and our court majority accepts, as a shield behind whose probable cause finding they can hide. [2]

**\*19** Of course, the manipulation of a magistrate who issues an arrest warrant, accomplished by malicious law enforcement, remains an untested allegation. But at the dismissal stage—before we, as judicial government officers, confer immunity as a matter of law on executive government officers—a comprehensive complaint that law enforcement misled a court must be taken not just as true, but in the light most favorable to the citizen-complainant. *See McLin v. Ard*, 866 F.3d 682, 689–90 & n.3 (5th Cir. 2017).

Otherwise, the "independent intermediary doctrine" would over-protect police misconduct, and even reward it. Indeed, the heart of the independent intermediary doctrine—which has strong critics, such as the Cato Institute, appearing before us here as amicus curiae [3]—depends on the assumption in its title. A judicial "intermediary," whose post-hoc determination will operate legally to shield police from liability for unconstitutional action, must of course be "independent" from the underlying illegality. Thus, "if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation' for the Fourth Amendment violation." *Jennings v. Patton*, 644 F.3d 297, 300–01 (5th Cir. 2011) (*quoting Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010)). But this is true only "whe[n] all the facts are presented to the grand jury, or other independent intermediary[,] where the malicious motive of the law enforcement officials does not lead them to withhold *any* relevant information from the independent intermediary." *Cuadra*, 626 F.3d at 813 (citation omitted) (emphasis added). Otherwise, a malicious officer seeking to obtain a facially valid arrest warrant would "be absolved of liability simply because he succeeded." *Thomas v. Sams*, 734 F.2d 185, 191 (5th Cir. 1984) (citation omitted); *see also Wilson v. Stroman*, 33 F.4th 202, 208 (5th Cir. 2022).

This is our court's settled "taint" exception critical to our independent intermediary doctrine—in the vernacular, preventing "garbage in, garbage out"—which we have restated for over thirty years. *See Hand v Gary*, 838 F.2d 1420, 1427-28 (5th Cir. 1988) ("[T]he chain of causation is broken only where *all the facts* are presented to the grand jury, where the malicious motive of the law enforcement officials does not lead them to withhold any relevant information ... from the independent intermediary. *Any* misdirection of the magistrate or the grand jury by omission or commission perpetuates the taint of the original official behavior.") (emphases added); *Winfrey v. Rogers*, 901 F.3d 483, 497 (5th Cir. 2018) (same); *see also Morris v. Dearborne*, 181 F.3d 657, 673 (5th Cir. 1999) ("The question of causation is 'intensely factual' ... A fact issue exists regarding the extent to which (if at all) Dearborne subverted the ability of the court to conduct independent decision making by providing false information, and in so doing, withholding true information.").

It is important to emphasize, again, that ==Villarreal== may be wrong in her accusation of malice and law enforcement abuse of office. The Defendants may not have misled anyone to secure their warrants to arrest her. But when there is uncertainty, especially at the dismissal stage, *see McLin*, 866 F.3d at 689-690 & n.3, we are explicit that this judicially-created shield from liability for a false arrest "does not apply," *Winfrey*, 901 F.3d at 497. And we are equally clear that at the dismissal stage, "it is [the defendant's] burden to prove the omitted material information was presented to the [intermediary that found probable cause]." *Winfrey v. Johnson*, 766 F. App'x 66, 71 (5th Cir. 2019) (applying *Winfrey*, 901 F.3d at 497). Otherwise, police immunity would mean police impunity. *See Bledsoe v. Willis*, No. 23-30238, 2023 WL 8184814, at \*4–5 (5th Cir. Nov. 27, 2023) (unpublished).

**II. Because ==Villarreal== alleges her arrest was atypical, her arrestors do not get immunity without inquiry even if they had probable cause to arrest her.**

**\*20** When a plaintiff alleges that she was arrested in retaliation for First Amendment activity, "probable cause should generally defeat a retaliatory arrest claim." *Nieves*, 139 S. Ct. at 1727. But "when a plaintiff presents objective evidence that [s]he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been," she can prevail even if the arresting officer had probable cause. *Id.*

**Villarreal's** first amended complaint alleges that "[Officer Defendants] selected the Statute as a pretext to target **Villarreal**. They did so despite knowing that LPD, WDCA, and the Webb County Sheriff had never arrested, detained, or prosecuted any person before under the Statute." This conduct falls squarely within the *Nieves* exception. In fact, there could be no better example of a crime never enforced than this one. Texas has never prosecuted it to conviction, ever. At no point in their district or appellate court briefing did Defendants contest **Villarreal's** allegation that law enforcement in Laredo and Webb County, or indeed, any prosecutor anywhere in Texas, had pursued anyone besides her under § 39.06(c). That fact alone—putting to the side **Villarreal's** detailed and so-far-untested allegations of police animus, as well as Texas courts' invalidation of the criminal offense used to arrest her [4]—means that seizing and jailing **Villarreal** should trigger the *Nieves* atypical-arrest exception and defeat, at the motion to dismiss stage, any probable cause the majority imagines conferred immunity on Defendants.

In lieu of countering **Villarreal's** actual allegation, Defendants cite two cases in their briefing to us for the proposition that Texas juries in other counties had returned convictions under § 39.06, generally. However, neither of these cases concerned the *solicitation* subsection, § 39.06(c), under which **Villareal** was charged. Rather, both of those cases involved public corruption convictions of public servants under § 39.06(a) and (b). Moreover, neither implicated First Amendment concerns. *See Reyna v. State*, No. 13-02-00499-CR, 2006 WL 20772 (Tex. App. Jan. 5, 2006) (unpublished); *Tidwell v. State*, No. 08-11-00322-CR, 2013 WL 6405498 (Tex. App. Dec. 4, 2013) (unpublished). In *Reyna*, the defendant was a city administrator in Los Fresnos, Cameron County, who used private information about bidding processes to award construction contracts to his affiliates, *Reyna*, 2006 WL 20772, at *1–2; *Tidwell* involved the Winkler County Attorney using confidential, anonymous complaints to the Texas Medical Board regarding a doctor's unethical behavior to initiate a malicious prosecution of the two nurses who blew the whistle on that behavior, *Tidwell*, 2013 WL 6405498, at *14. Neither instance contradicts **Villarreal's** contention that her offense has never been prosecuted successfully in Texas, much less in Webb County, nor certainly against a journalist—exactly the kind of "circumstance[ ] where officers have probable cause to make arrests, but typically exercise their discretion not to do so" that requires an exception to the probable-cause rule. *Nieves*, 139 S. Ct. at 1727.

**\*21** Despite *Nieves*'s applicability here, the district court dismissed in a footnote **Villarreal's** argument that law enforcement did not prosecute anyone under Texas Penal Code § 39.06(c) before her. The district court held that **Villarreal's** description in her pleading of "similarly-situated persons" as those persons who (a) "asked for or received information from local law enforcement officials" and (b) "published truthful and publicly-accessible information on a newsworthy matter" was "conclusory." Further, the district court held that she did not "appropriately define similarly situated individuals" because her description might have included people "who obtained information from LPD's public spokesperson." Therefore, the district court determined, **Villarreal's** complaint did not establish that she fit within the *Nieves* exception.

But the district court erred in holding that a pure factual allegation—that "LPD and WCDA had never before arrested, detained, or prosecuted any other person under TEXAS PENAL CODE § 39.06, let alone any person similarly-situated to **Villarreal**, during the 23 years the operative version of the statute had been in effect"—was "conclusory" and too broad. The district court's holding that "similarly-situated persons" was not narrowly construed enough for **Villarreal** to state a claim sets up an unreasonable and needless hoop for a plaintiff to jump through. Her allegation is that neither the LPD nor the WCDA— nor indeed, any police officer or prosecutor in Texas—has ever arrested or charged anyone, including newsgatherers, for this offense. Such a contention surely encompasses those who "lawfully" obtained information from a press official as well as those who did not, unless we presuppose that no journalist has ever before relied on a back-channel government source to obtain information. Black's Law Dictionary defines "conclusory" as "expressing a factual inference without stating the underlying facts on which the inference is based." *Conclusory*, BLACK'S LAW DICTIONARY (11th ed. 2019). That **Villarreal's** factual allegation was that something had never happened—resulting in a null set of individuals never arrested or charged and cases never prosecuted—does not transform her factual allegation into an inference. [5]

This case is straightforward. **Villarreal** alleged in her complaint that her arrest for violating § 39.06(c) constituted a "circumstance[ ] where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves*, 139 S. Ct. at 1727. Hence, her allegation of retaliatory police arrest falls under the exception to the probable-cause rule and survives dismissal. By continuing to overlook this law, our court compounds a constitutional error that countenances, with

neither inquiry nor discovery, dismissal of an American citizen-journalist's complaint that her newsgathering led to arrest for something that Texas courts have confirmed is not a crime.

**Conclusion**

**\*22**  For the reasons discussed above, I would vacate the district court's dismissal of **Villarreal's** complaint. Our court errs in holding that these Defendants had probable cause to arrest her without testing the factual allegation that the magistrate who issued her arrest warrants was tainted by "misrepresentations and omissions" from her alleged antagonists. Our court further errs in failing to apply *Nieves* to test whether, even if Laredo law enforcement had probable cause to arrest her, they did so in retaliation for her news reporting. In short, **Villarreal's** complaint requires discovery and fact-assessment, applying settled law. This court should not countenance the erosion of the First Amendment's protection of citizen-journalists from intimidation by the government officials they seek to hold accountable in their reporting.

Don R. Willett, Circuit Judge, joined by Elrod, Graves, Higginson, Ho, and Douglas, Circuit Judges, dissenting:
For many of the reasons persuasively penned by my dissenting colleagues, I agree that the district court erred by dismissing **Villarreal's** claims on qualified-immunity grounds. I write separately to underscore three brief points.

*First*, one of the justifications so frequently invoked in defense of qualified immunity—that law enforcement officers need "breathing room" to make "split-second judgments"—is altogether absent in this case. [1]  This was no fast-moving, high-pressure, life-and-death situation. Those who arrested, handcuffed, jailed, mocked, and prosecuted **Priscilla Villarreal**, far from having to make a snap decision or heat-of-the-moment gut call, spent *several months* plotting **Villarreal's** takedown, dusting off and weaponizing a dormant Texas statute never successfully wielded in the statute's near-quarter-century of existence. This was not the hot pursuit of a presumed criminal; it was the premeditated pursuit of a confirmed critic. [2]  Also, while the majority says the officers could not have "predicted" that their thought-out plan to lock up a citizen-journalist for asking questions would violate the First Amendment [3]—a plan cooked up with legal advice from the Webb County District Attorney's Office, mind you—the majority simultaneously indulges the notion that **Villarreal** had zero excuse for not knowing that her actions might implicate an obscure, never-used provision of the Texas Penal Code. [4]  In other words, encyclopedic jurisprudential knowledge is imputed to **Villarreal**, but the government agents targeting her are free to plead (or feign) ignorance of bedrock constitutional guarantees. In the upside-down world of qualified immunity, everyday citizens are demanded to know the law's every jot and tittle, but those charged with *enforcing* the law are only expected to know the "clearly established" ones. Turns out, ignorance of the law *is* an excuse—for government officials. [5]  Such blithe "rules for thee but not for me" nonchalance is less qualified immunity than unqualified impunity. The irony would be sweet if **Villarreal's** resulting jailtime were not so bitter, and it lays bare the "fair warning" fiction that has become the touchstone of what counts as "clearly established law." [6]

**\*23**  *Second*, just as officers can be liable for enforcing an obviously unconstitutional statute, [7]  they can also be liable for enforcing a statute in an obviously unconstitutional way. [8]  The majority opinion seems to rest its holding on the principle that the officers reasonably presumed that Penal Code § 39.06 was constitutional. [9]  Whatever one might think of that principle or the majority's application of it, ending the analysis there stops a half-step short. It does not account for the possibility—indeed, the real-world certainty—that government officials can wield facially constitutional statutes as blunt cudgels to silence speech (and to punish speakers) they dislike, here in a vengeful, calculated fashion, including months to consult legal counsel. [10]  So while we may not impute to officers the foreknowledge of what a federal court may later say, neither should we impute to officers the ignorance of what the First Amendment already says.

*Third*, this case illustrates (again) the one-sidedness of the modern immunity regime. The plain text of § 1983 declares that government officials "shall be liable" for violating the Constitution if they were acting "under color of any [state] statute." [11]  But

in the majority's view, the officers evade liability under § 1983 precisely *because* they were acting pursuant to a state statute. [12] However erroneous that holding might be under *Monroe v. Pape*, [13] it would not be quite so discomfiting were it not for the fact that courts have also engrafted onto § 1983 assorted made-up defenses that cannot possibly be squared with the statutory text. [14] If nothing else, today's decision underscores a striking statutory double standard: Judges read *out* text that is plainly there, and read *in* text that is plainly not—both for the benefit of rights-violating officials. Whatever the operative language of § 1983 says, or does not say, current judge-invented immunity doctrine seems hardwired—relentlessly so—to resolve these questions in one direction and one direction only. Counter-textual immunity is a one-way ratchet, and regrettably, today's decision inflicts yet another wrong turn.

**\*24**  I respectfully dissent.

James C. Ho, Circuit Judge, joined by Elrod, Graves, Higginson, Willett, and Douglas, Circuit Judges, dissenting:

If the First Amendment means anything, surely it means that citizens have the right to question or criticize public officials without fear of imprisonment. The Constitution doesn't mean much if you can only ask questions approved by the state. Freedom of speech is worthless if you can only express opinions favored by the authorities. The government may not answer or agree —but the citizen gets to ask and to speak.

As the Supreme Court has long recognized, "[t]he right to speak freely and to promote diversity of ideas and programs is ... one of the chief distinctions that sets us apart from totalitarian regimes." *Ashton v. Kentucky,* 384 U.S. 195, 199, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966) (quoting *Terminiello v. City of Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949)). "The right of citizens to inquire ... is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC,* 558 U.S. 310, 339, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).

The right to speak freely and to inquire is precisely what's at stake in this case.

Like every American, **Priscilla Villarreal** holds views that are shared by some—and disliked by others. But a group of police officers and prosecutors in Laredo weren't content to simply disagree with her. They had to weaponize the coercive powers of the criminal justice system against her.

So they charged her and jailed her for asking a police officer a question.

The majority bristles at this short-hand description. But facts are stubborn things. Just look at the majority's own recitation of the facts presented in this case:

Defendants don't like that **Villarreal** "frequently posts ... content unfavorable to the Laredo Police Department, ... the district attorney, and other local officials." *Ante,* at ——. So they "engaged in a campaign to harass and intimidate her and stifle her work." *Id.* After a months-long investigation, they settled on a strategy to "arrest **Villarreal** for [having] conversations with" a police officer. *Id.* at ——. They chose that strategy because, during those conversations, the officer voluntarily answered her request for the names of two decedents—one involving a traffic accident, the other, a suicide. *Id.* at —— – ——. So they charged her with "soliciting information that had not yet been officially made public"—namely, "the name and condition of a traffic accident victim and the name and identification of a suicide victim." *Id.* at ——, ——. All they could find to charge her was a statute that had previously been held unconstitutional, and by all accounts has never been the basis of a successful prosecution. *Id.* at ——. But that was fine with them, because their real objective was not to convict, but to humiliate. And that's exactly how Defendants used **Villarreal's** time in county jail: "[M]any LPD officers ... surrounded her, laughed at her, took pictures with their cell phones, and otherwise showed their animus toward **Villarreal** with an intent to humiliate and embarrass her." *Id.* at —— (cleaned up).

**\*25**  So in sum, **Villarreal** politely asked a question—and an officer voluntarily answered. No one forced the officer to answer. **Villarreal** did nothing to warrant an aggressive, coercive response by law enforcement. The actions taken here were not split-second judgments calls. No innocent lives were at stake. No violent armed criminal was at large. *Contrast, e.g., Winzer v. Kaufman County,* 940 F.3d 900 (5th Cir. 2019). Instead, this was a months-long effort to come up with something—*anything*—to make a popular local citizen-journalist pay for her unfavorable coverage of local police and prosecutors.

All that **Villarreal** seeks from us is the dignity of presenting her powerful allegations to a jury of her peers. We should've granted her request—or at least resolved her appeal in timely fashion (panel argument took place in February 2021, nearly three years ago). Because **Villarreal** convincingly alleges not one but multiple violations of our Constitution.

To begin with, the operative complaint presents two distinct theories of First Amendment liability—**Villarreal** alleges both a direct violation and unconstitutional retaliation. As our court has observed, "the First Amendment prohibits not only direct limitations on speech but also ... retaliation against the exercise of First Amendment rights." *Colson v. Grohman,* 174 F.3d 498, 508–9 (5th Cir. 1999). The government can't arrest you for engaging in protected speech. That would constitute a direct violation of your First Amendment rights. In addition, the First Amendment also prohibits the government from arresting you because it dislikes your views. That would be unconstitutional retaliation under the First Amendment.

**Villarreal** presents both theories. She alleges that Defendants directly interfered with her First Amendment rights by arresting her for asking questions. And she further alleges that Defendants retaliated against her because they dislike her criticisms of Laredo police and prosecutors. These are distinct theories of liability. We should examine them both. *See, e.g., Davidson v. City of Stafford,* 848 F.3d 384, 398 (5th Cir. 2017) (noting that "[t]he district court appears to have addressed only [the plaintiff's] First Amendment claim in the context of § 1983 retaliation," and failed to address his separate claim that his "arrest resulted in an as-applied violation of [his] First Amendment rights"). And she should be allowed to proceed on both.

Furthermore, **Villarreal** contends that this blatant misuse of law enforcement resources against a disfavored citizen presents Fourth Amendment as well as other claims that warrant trial.

In response, Defendants claim that Texas Penal Code § 39.06(c) justifies their campaign against **Villarreal**. But this statutory defense to liability under § 1983 is deficient in several obvious respects.

To start, there's the Supremacy Clause. U.S. CONST. art. VI, cl. 2. Federal constitutional rights obviously trump state statutes. And courts have repeatedly held § 39.06(c) unconstitutional—whether facially or as applied—both before and after **Villarreal's** arrest. *See State v. Newton,* 179 S.W.3d 104, 107, 111 (Tex. App.—San Antonio 2005) (observing that "[t]he trial court ... held that subsections (c) and (d) of § 39.06 are unconstitutionally void for vagueness," and affirming on statutory grounds, while expressly reserving the constitutional question); *State v. Ford,* 179 S.W.3d 117, 120, 125 (Tex. App.—San Antonio 2005) (same). That presumably explains why no one has been able to identify a single successful prosecution ever brought under § 39.06(c)—and certainly never against a citizen for asking a government official for basic information of public interest so that she can accurately report to her fellow citizens.

**\*26**  It should be obvious why public officials can't enforce state laws in an obviously unconstitutional manner. The plain text of § 1983 expressly imposes liability on state actors who violate the Constitution "under color of [state law]." 42 U.S.C. § 1983. The Supreme Court has applied § 1983 accordingly. *See, e.g., Myers v. Anderson,* 238 U.S. 368, 382, 35 S.Ct. 932, 59 L.Ed. 1349 (1915) ("the new statute did not relieve the new officers of their duty, nor did it interpose a shield to prevent the operation upon them of the provisions of the Constitution") (construing predecessor to § 1983); *Tanzin v. Tanvir,* 592 U.S. 43, 50, 141 S.Ct. 486, 208 L.Ed.2d 295 (2020) (section 1983 "impos[es] liability on any person who, under color of state law, deprived another of a constitutional right") (citing *Myers,* 238 U.S. at 379, 383, 35 S.Ct. 932). There's also broad consensus across the circuits that "some statutes are so obviously unconstitutional that we will require officials to second-guess the legislature and refuse to enforce an unconstitutional statute—or face a suit for damages if they don't." *Lawrence v. Reed,* 406 F.3d 1224, 1233 (10th Cir. 2005).

Tellingly, none of the parties disputes this principle. Only the majority flirts with the extreme notion that public officials are categorically immune from § 1983 liability, no matter how obvious the depredation, so long as they can recite some statute to justify it. *See ante*, at —— – —— (rejecting "the idea of 'obvious unconstitutionality' " as a basis for § 1983 liability). It's a recipe for public officials to combine forces with state or local legislators to do—whatever they want to do. It's a level of blind deference and trust in government power our Founders would not recognize.

What's worse, in addition to the obvious constitutional problems, Defendants fail to show that **Villarreal** violated § 39.06(c) in the first place.

Section 39.06(c) purports to prohibit citizens from asking a public servant for certain non-public information. It's only a crime, however, if the information meets the criterion specified by subsection (d).

Yet by all indications, Defendants were entirely unaware of subsection (d) when they used § 39.06(c) to justify **Villarreal's** arrest. Subsection (d) makes clear that a citizen violates § 39.06(c) only when she asks for non-public information that is "prohibited from disclosure under" the Texas Public Information Act. But nowhere in their arrest warrant affidavits or charging documents do Defendants ever mention subsection (d) or its requirements—let alone identify which prohibition on disclosure **Villarreal** violated.

And if all that weren't enough, even counsel's belated post hoc efforts fail to identify a relevant prohibition on disclosure. **Villarreal** is charged with nothing more than seeking "the name and condition of a traffic accident victim and the name and identification of a suicide victim." *Ante*, at ——. The majority claims this is sensitive information about a pending criminal investigation, and therefore shielded from disclosure under § 552.108 of the Texas Government Code. But that's wrong for several reasons, the most simple of which is this: Subsection (c) of that provision *requires* the release of "basic information about an arrested person, an arrest, or a crime." It's hard to imagine anything more "basic" than a person's name. Every authority cited by the majority supports that view. *See, e.g.*, Tex. Att'y Gen. Op. ORD–127, at 9 (1976) ("the press and the public have a right of access to information concerning crime in the community and to information relating to activities of law enforcement agencies," including, among other things, "the name and age of the victim") (citing *Houston Chron. v. City of Houston*, 536 S.W.2d 559 (Tex. 1976)); *Indus. Found. of the South v. Texas Indus. Accident Bd.*, 540 S.W.2d 668, 685, 686 (Tex. 1976) (a person's "name" and "identity" does not constitute "highly intimate or embarrassing facts" whose release would be "highly objectionable to a reasonable person" and thus must be disclosed); *see also* Tex. Att'y Gen. Op. OR2022–36798 (2022) (citing *Indus. Found.*, 540 S.W.2d at 685).

  **\*27**  So even if I accepted the majority's extreme vision where public officials and legislators can overturn federal constitutional rights at their whim—and make no mistake, I don't—Defendants fail to present a valid statutory basis for infringing on **Villarreal's** fundamental right to freedom of speech without fear of incarceration.

* * *

That's the executive summary. Further details are provided below. But the most important point is this: If any principle of constitutional law ought to unite all of us as Americans, it's that the government has no business imprisoning citizens for the views they hold or the questions they ask.

So it's gratifying that a diverse amicus coalition of nationally recognized public interest groups organized by the Foundation for Individual Rights and Expression—including Alliance Defending Freedom, Americans for Prosperity Foundation, the Cato Institute, the Constitutional Accountability Center, the Electronic Freedom Foundation, the First Liberty Institute, the Institute for Justice, and Project Veritas—stands firmly behind **Villarreal**.

I'm sure that a number of these amici disagree with **Villarreal** on a wide range of issues. But although they may detest what she says, they all vigorously defend her right to say it. These organizations no doubt have many pressing matters—and limited resources. Yet they each decided that standing up to defend the Constitution in this case was worth the squeeze.

This united front gives me hope that, even in these divided times, Americans can still stand up and defend the constitutional rights of others—including even those they passionately disagree with. We all should have joined them in this cause. Because my colleagues in the majority decline to do so, I must dissent.


## I.

This should've been an easy case for denying qualified immunity. The First Amendment obviously protects the freedom of speech. That protection has long been incorporated against state and local governments under the Due Process Clause. And it should go without saying that the freedom of speech includes not only the right to speak, but also the right to criticize as well as the right to ask questions.

Indeed, the First Amendment expressly protects not only "the freedom of speech" but also "the right ... to petition the Government for a redress of grievances." U.S. CONST. amend. I. It would make no sense for the First Amendment to protect the right to speak, but not to ask questions—or the right to petition the government for a redress of grievances, but not for information.

It should be obvious, then, that citizens have the right to ask questions and seek information. *See, e.g., Citizens United*, 558 U.S. at 339, 130 S.Ct. 876 (recognizing the First Amendment "right of citizens to inquire, to hear, to speak, and to use information"); *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 99, 103, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979) ("The reporters ... obtained the name of the alleged assailant simply by asking various witnesses, the police, and an assistant prosecuting attorney"—which are all "routine newspaper reporting techniques" protected by the First Amendment); *see also* **Villarreal** *v. City of Laredo*, 44 F.4th 363, 371 (5th Cir. 2022) (collecting other cases and examples).

The fact that the question or request for information happens to be directed to a police officer does not change the equation. The Supreme Court has long made clear that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462–63, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). So a law that purports to prohibit speech that "interrupts an officer" would plainly violate the First Amendment. *Id.* at 462, 107 S.Ct. 2502 (cleaned up). As the Court put it, "[t]he Constitution does not allow such speech to be made a crime." *Id.* And if it's unconstitutional to prohibit a citizen from interrupting a police officer, it's *a fortiori* unconstitutional to prohibit a citizen from politely asking a police officer a question.

 **\*28** It should have been obvious to Defendants, then, that they were violating **Villarreal's** First Amendment rights when they arrested and jailed her for asking a police officer for information. And that should be devastating to their claim of qualified immunity.

The Supreme Court has made clear that public officials who commit obvious constitutional violations are not entitled to qualified immunity. In fact, the Court has repeatedly reversed circuits, including ours, for granting qualified immunity for obvious violations of constitutional rights. *See, e.g., Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Taylor v. Riojas*, 592 U.S. 7, 9, 141 S.Ct. 52, 208 L.Ed.2d 164 (2020).

The majority responds that the standard articulated in *Hope* and *Taylor* doesn't apply here, because those cases arose under the Eighth Amendment, not the First Amendment. *Ante*, at ——.

But that would treat the First Amendment as a second-class right. Nothing in § 1983 suggests that courts should favor the Eighth Amendment rights of convicted criminals over the First Amendment rights of law-abiding citizens. Nothing in *Hope* or *Taylor* indicates that those decisions apply only to prison conditions. And no other circuit takes the approach urged by our colleagues in the majority. To the contrary, nine circuits have indicated that the standards articulated in *Hope* apply specifically in the First Amendment context. *See, e.g., Diaz-Bigio v. Santini*, 652 F.3d 45, 50 (1st Cir. 2011); *Nagle v. Marron*, 663 F.3d 100, 115–116 (2nd Cir. 2011); *McGreevy v. Stroup*, 413 F.3d 359, 366 (3rd Cir. 2005); *Tobey v. Jones*, 706 F.3d 379, 391 n.6 (4th Cir. 2013); *MacIntosh v. Clous*, 69 F.4th 309, 399 (6th Cir. 2023); *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 798 (7th Cir. 2016); *Galvin v. Hay*, 374 F.3d 739, 746–47 (9th Cir. 2004); *Frasier v. Evans*, 992 F.3d 1003, 1021–22 (10th Cir. 2021); *Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1345–46 (11th Cir. 2013). *See also Cheeks v. Belmar*, 80 F.4th 872, 877 (8th Cir. 2023) (applying *Hope* to the Fourteenth Amendment); *Atherton v. Dist. of Columbia Off. of the Mayor*, 706 F.3d 512, 515 (D.C. Cir. 2013) (applying *Hope* to the Fifth Amendment).

So I would apply *Hope* and *Taylor* in the First Amendment context. *See also Morgan v. Swanson*, 659 F.3d 359, 412, 414 n.30 (5th Cir. 2011) (en banc) (Elrod, J., dissenting in part) (concluding that *Hope* applies to obvious First Amendment violations).

That's what the Supreme Court did in *Sause v. Bauer*, ––– U.S. ––––, 138 S. Ct. 2561, 201 L.Ed.2d 982 (2018). Two police officers entered a woman's living room in response to a noise complaint. When she knelt down to pray, the officers ordered her to stop, despite the lack of any apparent law enforcement need. *Id.* at 2562. The Tenth Circuit granted qualified immunity on the ground that Sause couldn't "identify a single case in which this court, or any other court for that matter, has found a First Amendment violation based on a factual scenario even remotely resembling the one we encounter here." *Sause v. Bauer*, 859 F.3d 1270, 1275 (10th Cir. 2017). But the Supreme Court summarily reversed, holding that "there can be no doubt that the First Amendment protects the right to pray." *Sause*, 138 S. Ct. at 2562. [1]

**\*29** *Sause* readily applies here. Just as it's obvious that Sause has the right to pray, it's equally obvious that **Villarreal** has the right to ask questions.

## A.

I suppose it's understandable, given the obvious First Amendment violation alleged in this case, why the majority would like to avoid the First Amendment inquiry altogether. It opens by claiming that Defendants don't have to comply with the First Amendment *at all. Ante*, at ––––.

The theory appears to go something like this: **Villarreal** is challenging an arrest. So she can't state a First Amendment claim unless she first establishes a Fourth Amendment claim. To quote the majority: "Because **Villarreal's** First Amendment free speech claim arises from her arrest," it's "inextricable from her Fourth Amendment claim"—so "liability for both [claims] rises and falls on whether the officers violated clearly established law under the Fourth Amendment." *Id. See also id.* at –––– ("Since there was no Fourth Amendment violation, the officers have qualified immunity on these grounds alone from **Villarreal's** First Amendment claims.").

There are a number of problems with the majority's theory, but the simplest is this: It spells the end of the First Amendment. All the government would have to do is to enact some state statute or local ordinance forbidding some disfavored viewpoint —and then wait for a citizen to engage in that protected-yet-prohibited speech. The police would have ample probable cause for arrest under the Fourth Amendment. But it would be an indisputable violation of the First Amendment. Yet the majority would conclude that there is no First Amendment liability.

This makes no sense. It's a roadmap for destroying the First Amendment. And unsurprisingly, there is no case law to support it.

In fact, the only authority the majority cites for this proposition is, curiously, *Sause*. That's a problem for the majority, because its theory gets *Sause* backward: The whole point of *Sause* is that police actions like arrests are subject to First Amendment as well as Fourth Amendment scrutiny. As the Supreme Court has explained, *Sause* shows that "[t]here is no doubt that damages claims have always been available under § 1983 for clearly established violations of the First Amendment." *Tanzin*, 592 U.S. at 50, 141 S.Ct. 486 (citing *Sause*).

The majority cites no authority that construes *Sause* to supplant the First Amendment in favor of the Fourth Amendment whenever an arrest is involved. To the contrary, the majority's theory contradicts not only *Tanzin* but also other Supreme Court decisions that subject arrests to First Amendment scrutiny. For example, both *Lozman v. City of Riviera Beach*, ––– U.S. ––––, 138 S. Ct. 1945, 201 L.Ed.2d 342 (2018), and *Nieves v. Bartlett*, ––– U.S. ––––, 139 S. Ct. 1715, 204 L.Ed.2d 1 (2019), hold that, even where there is probable cause to arrest under the Fourth Amendment, the First Amendment forbids a police officer from retaliating against a citizen for engaging in protected speech. *See Lozman*, 138 S. Ct. at 1949 ("the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech"); *Nieves*, 139 S. Ct. at 1727 ("it would seem insufficiently protective of First Amendment rights to dismiss ... on the ground that there was undoubted probable cause for the arrest"). [2]

**\*30** The majority's misreading of *Sause* also places us in square conflict with countless circuit decisions around the country that subject police arrests to First Amendment analysis—such as cases involving peaceful protestors.

In *Davidson*, for example, the plaintiff was arrested while protesting an abortion clinic and expressing his pro-life views there. 848 F.3d at 388. Our colleagues on that panel agreed that individuals arrested while peacefully protesting are obviously "protected under the First Amendment." *Id.* at 391. Notably, it didn't matter that the officers claimed a statutory basis for arresting the plaintiff. "Reasonable officers ... must ... consider the balance between [the protestor's] First Amendment rights and the right of the public to have access to the Clinic." *Id.* at 393.

Similarly, consider a recent ruling by the same circuit reversed in *Sause*. *See Jordan v. Jenkins*, 73 F.4th 1162 (10th Cir. 2023). The facts of *Jordan* are remarkably analogous to those presented here: A citizen verbally criticizes a police officer. The police officer is upset by the criticism. So he (wrongly) arrests the citizen, and finds some statute to justify the arrest. The Tenth Circuit held that the citizen's "verbal criticism was clearly protected by the First Amendment." *Id.* at 1168. [3]

### B.

Forced to confront the obvious First Amendment violation presented in this case, the majority counters that a public official can't be held liable so long as the official can invoke some statutory justification—no matter how obvious the constitutional deprivation. *See ante*, at ––– – ––––.

That's wrong on several levels. To begin with, it turns the plain text of § 1983 on its head. The whole point of § 1983 is to hold public officials accountable if they violate the Constitution "under color of any statute, ordinance, regulation, custom, or usage, of any State." To be sure, the presence of a state statute is no longer a requirement for § 1983 liability after *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). But it would get § 1983 entirely backward if the existence of a state statute is not only no longer a required element of liability, but a defense to liability altogether.

Not surprisingly, then, none of the parties dispute that public officials are liable if they've committed an obvious violation of a person's constitutional rights, regardless of whether a state statute authorizes the official's actions. A mountain of Supreme Court and circuit precedent reinforces this principle. *See, e.g., Myers*, 238 U.S. at 382, 35 S.Ct. 932 ("the new statute did not relieve the new officers of their duty, nor did it interpose a shield to prevent the operation upon them of the provisions of the Constitution") (construing predecessor to § 1983); *Tanzin*, 592 U.S. at 50, 141 S.Ct. 486 (section 1983 "impos[es] liability on any person who, under color of state law, deprived another of a constitutional right") (citing *Myers*, 238 U.S. at 379, 383,

35 S.Ct. 932*); *Lawrence*, 406 F.3d at 1233 ("some statutes are so obviously unconstitutional that we will require officials to second-guess the legislature and refuse to enforce an unconstitutional statute—or face a suit for damages if they don't"); *see also Guillemard-Ginorio v. Contreras-Gomez*, 490 F.3d 31, 40–41 (1st Cir. 2007); *Vives v. City of New York*, 405 F.3d 115, 118 (2nd Cir. 2005); *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 103 (2nd Cir. 2003); *Leonard v. Robinson*, 477 F.3d 347, 359 (6th Cir. 2007); *Ballentine v. Tucker*, 28 F.4th 54, 66 (9th Cir. 2022); *Carey v. Nevada Gaming Control Bd.*, 279 F.3d 873, 881 (9th Cir. 2002); *Jordan*, 73 F.4th 1162; *Thompson v. Ragland*, 23 F.4th 1252, 1255–56 (10th Cir. 2022); *Lederman v. United States*, 291 F.3d 36, 47 (D.C. Cir. 2002).

 **\*31**  The majority ignores all of this and instead claims that there is, at most, only "a *possible* exception for 'a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws.' " *Ante*, at ——— (quoting *Michigan v. DeFilippo*, 443 U.S. 31, 38, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)). None of the parties make this argument, or cite *DeFilippo* anywhere in their briefs to support it.

So what does the majority's theory mean for this circuit? It means that public officials can engage in "obviously unconstitutional" violations all they want. They just can't commit "grossly and flagrantly unconstitutional" ones. Maybe.

Under today's ruling, then, citizens in future cases within the Fifth Circuit will have to litigate not only whether their rights have been violated, but whether the violation is merely "obvious" (and thus not actionable) or "gross and flagrant" (and therefore might be actionable).

But as for this case, it ought to be enough that arresting citizens for "speak[ing] freely" is exactly how "totalitarian regimes" behave. *Ashton*, 384 U.S. at 199, 86 S.Ct. 1407. I'll leave it to the majority to explain why a totalitarian government is not as bad as a grossly and flagrantly unconstitutional one.

C.

So Defendants cannot avoid liability for obvious constitutional violations by invoking a state statute. Moreover, § 39.06(c) of the Texas Penal Code is a particularly weak justification.

To begin with, courts have repeatedly held § 39.06(c) unconstitutional, whether facially or as applied, both before as well as after Villarreal's arrest. *See Newton*, 179 S.W.3d at 107, 111 (observing that "[t]he trial court ... held that subsections (c) and (d) of § 39.06 are unconstitutionally void for vagueness," and affirming on statutory grounds, while expressly reserving the constitutional question); *Ford*, 179 S.W.3d at 120, 125 (same). [4]

Not surprisingly, then, no one has identified a single prosecution ever successfully brought under § 39.06(c)—and certainly not one against a citizen for requesting basic information of public interest so that she can report the information to fellow citizens. [5]

But what's more, Defendants have never been able to explain how Villarreal violated § 39.06(c) to begin with.

 **\*32**  Section 39.06(c) makes it a crime for any citizen to ask a public servant for certain non-public information. But it's only a crime if the information meets the criterion specified by subsection (d).

Subsection (d) makes clear that a citizen violates § 39.06(c) only when she asks for non-public information that is "prohibited from disclosure under" the Texas Public Information Act. But nowhere in their arrest warrant affidavits or charging documents do Defendants ever mention subsection (d) or its requirements—let alone identify which prohibition on disclosure Villarreal violated.

By all indications, Defendants were simply unaware of subsection (d) when they used § 39.06(c) to justify Villarreal's arrest.

Moreover, even after the fact, counsel has been unable to identify a relevant prohibition on disclosure.

**Villarreal** is charged with requesting "the name and condition of a traffic accident victim and the name and identification of a suicide victim." *Ante*, at ——. The majority contends that this is sensitive information about a pending criminal investigation and therefore shielded from disclosure under § 552.108 of the Texas Government Code. *Ante*, at ——. But subsection (c) of that same provision *requires* the release of "basic information about an arrested person, an arrest, or a crime."

In the absence of a statutory prohibition on disclosure, the majority scrambles and identifies a small handful of other authorities. But none of the majority's authorities establish a crime by **Villarreal**. *Ante*, at ——–——. To the contrary, every authority cited by the majority undermines its claims.

The majority cites *Houston Chronicle.* But there the city was required to release a broad range of basic information—including "the offense committed, location of the crime, identification and description of the complainant, the premises involved, the time of the occurrence, description of the weather, a detailed description of the offense in question, and the names of the investigating officers," 536 S.W.2d at 561, as well as the property and vehicles involved. *See Houston Chron. Pub'g Co. v. City of Houston,* 531 S.W.2d 177, 187 (Tex. App.—Houston [14th Dist.] 1975).

Next, the majority cites a 1976 Texas Attorney General opinion, Tex. Att'y Gen. Op. ORD–127. But that opinion construes *Houston Chronicle* to hold that "the press and the public have a right of access to information concerning crime in the community and to information relating to activities of law enforcement agencies"—including, among other things, "the name and age of the victim." *Id.* at 9, 141 S. Ct. 52, 54.

The majority also cites *Industrial Foundation.* But that decision holds only that "highly intimate or embarrassing facts" may be excluded from disclosure under certain circumstances. 540 S.W.2d at 685. What's more, it also holds that the release of a person's "name" and "identity" would *not* be "highly objectionable to a reasonable person," and therefore must be disclosed. *Id.* at 686.

Finally, the majority cites a 2022 Texas Attorney General opinion, Tex. Att'y Gen. Op. OR2022–36798. But that opinion observes that "the right to privacy is a personal right that lapses at death," and therefore, "information relate[d] to deceased individuals ... may not be withheld from disclosure." *Id.* at 2-3, 69 S.Ct. 894. To be sure, the opinion also suggests that "surviving family members can have a privacy interest in information relating to their deceased relatives." *Id.* at 3, 69 S.Ct. 894 (citing *Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004)). But that interest would not extend to basic information such as the name of the decedent. Family members have a weaker interest in privacy than the decedent. *See* 541 U.S. at 167, 124 S.Ct. 1570 (family members are "not ... in the same position as" decedent). The family's privacy right is confined to only the most sensitive matters—namely, "the right of family members to direct and control disposition of the body of the deceased and to limit attempts to exploit pictures of the deceased family member's remains for public purposes." *Id.* (*Favish* goes on to detail the longstanding cultural sensitivities concerning "[b]urial rites or their counterparts [that] have been respected in almost all civilizations from time immemorial." *Id.* It also relies on authorities recognizing a family privacy right in "autopsy records" and "crime scene photographs," observing that "child molesters, rapists, murderers, and other violent criminals often make FOIA requests for autopsies, photographs, and records of their deceased victims." *Id.* at 169-70, 124 S. Ct. 1570, 1578.)

**\*33**  None of this remotely supports the conclusion that **Villarreal** broke the law by asking for a person's name. [6]

### D.

Notwithstanding these glaring constitutional and statutory defects, the majority insists that, because a state court magistrate agreed to issue the warrants, the independent intermediary rule entitles Defendants to immunity. As the majority puts it, "[a]

warrant secured from a judicial officer typically insulates law enforcement personnel who rely on it." *Ante*, at ——. "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination." *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 921, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)).

But it should be obvious by now that this is not remotely the "typical" or "ordinary" case. According to the complaint, Defendants jailed **Villarreal** for exercising her fundamental right to ask questions and petition officials for information of public interest. Moreover, they did so without even trying to satisfy the statutory requirements enumerated in subsection (d)—presumably because their goal was to humiliate, not incarcerate.

It's precisely because of cases such as this that the Supreme Court has warned us not to place blind trust in magistrates. The Court has cautioned us about the circumstances in which "a magistrate, working under docket pressures, will fail to perform as a magistrate should." *Malley v. Briggs*, 475 U.S. 335, 345–46, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). That's why courts must "require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment." *Id.* at 346, 106 S. Ct. 1092, 1096.

So courts may not allow police officers to shift responsibility to a magistrate. Instead, we must conduct an independent inquiry to determine "whether a reasonably well-trained officer ... would have known that his affidavit failed to establish probable cause, and that he should not have applied for the warrant." *Id.* at 345, 106 S. Ct. 1092, 1096. "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Id.* at 341, 106 S. Ct. 1092, 1096. *See also, e.g., Messerschmidt v. Millender*, 565 U.S. 535, 547, 132 S.Ct. 1235, 182 L.Ed.2d 47 (2012) (same); *United States v. Brouillette*, 478 F.2d 1171, 1175 (5th Cir. 1973) (finding warrant deficient because it lacked allegations to support "a necessary element of the ... criminal offense").

In holding officers accountable for their warrant applications, the Court readily acknowledged that "an officer who knows that objectively unreasonable decisions will be actionable may be motivated to reflect, before submitting a request for a warrant, upon whether he has a reasonable basis for believing that his affidavit establishes probable cause." *Malley*, 475 U.S. at 343, 106 S.Ct. 1092. "But such reflection is desirable, because it reduces the likelihood that the officer's request for a warrant will be premature." *Id.*

**\*34** That's precisely the problem with this case. The operative complaint presents compelling allegations that the officers here were motivated, not by considered judgment, but by malice. The officers here set aside both **Villarreal's** constitutional rights under the First Amendment and the statutory requirements of subsection (d)—conduct no objectively reasonable officer would have permitted. These obvious constitutional and statutory defects disentitle Defendants from the benefits of the independent intermediary rule.

### E.

There's an old adage among lawyers that, if you don't have the law on your side, pound the facts. And that's just what the majority does to **Villareal**.

For example, the majority disparages **Villarreal** for revealing information that "could have severely emotionally harmed the families of decedents and interfered with ongoing investigations." *Ante*, at ——. Never mind that **Villarreal** was jailed for soliciting information—not publishing it. And never mind that Defendants have presented no evidence of any emotional harm to families or interference with criminal investigations—to the contrary, the majority is actively *preventing* the parties from presenting evidence at trial.

What's worse, the majority hasn't explained how any of this provides a basis for curtailing a citizen's First Amendment rights. The threat of severe emotional distress certainly didn't stop the Supreme Court from enforcing the First Amendment in *Snyder*

*v. Phelps*, 562 U.S. 443, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011), despite the enormous pain that the speech undoubtedly caused the families of the decedents. Moreover, the Supreme Court has identified a number of constitutional rights that have " 'controversial public safety implications.' " *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 n.3, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022). There are no doubt citizens who would find it enormously stressful to see another citizen lawfully bearing firearms. *See, e.g., Glass v. Paxton*, 900 F.3d 233 (5th Cir. 2018). But I would venture a guess that the majority would not allow that emotional hardship to justify curtailment of a citizen's Second Amendment rights. The First Amendment deserves the same respect.

The majority also criticizes **Villarreal** for seeking this information "to capitalize on others' tragedies to propel her reputation and career." *Ante*, at ——. It is certainly true that people often engage in behavior out of self-interest. But that too is no basis for limiting a citizen's First Amendment rights. The First Amendment doesn't turn on why a citizen asks a question, or what she might gain by asking. Every citizen has the right to ask tough questions of their government. The Constitution is premised on the right to ask, not the need to ask. The First Amendment doesn't distinguish between altruistic and self-interested questions. There is no pro bono requirement to the freedom of speech. As the Supreme Court has repeatedly observed, "[s]peech ... is protected even though it is ... 'sold' for profit." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The fact that a speaker's "interest is a purely economic one ... hardly disqualifies him from protection under the First Amendment." *Id.* at 762, 96 S.Ct. 1817. *See also, e.g., Smith v. California*, 361 U.S. 147, 150, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (First Amendment applies to booksellers, because books are plainly covered by the First Amendment, and "[i]t is, of course, no matter that the dissemination takes place under commercial auspices"); *Thomas v. Collins*, 323 U.S. 516, 531, 65 S.Ct. 315, 89 L.Ed. 430 (1945) (rejecting contention that First Amendment rights don't apply when "the individual ... receives compensation" for exercising those rights); *Grosjean v. Am. Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936) (applying the First Amendment to corporations).

**\*35**   In addition, the majority finds it contemptible that **Villarreal** chose to seek information, not through the formal (and often painfully slow) mechanism of a public information request, but by communicating directly with a public official she knows. The majority condemns her for using an "illicit" "backchannel source." *See, e.g., ante*, at ——, ——, ——. But I doubt there's a single member of this court who hasn't sought non-public information from a "backchannel source"—for example, from a Senate aide who has information about the potential scheduling or other basic information about a pending judicial nomination (perhaps their own, or that of a friend). Defendants respond that Congress could make it a crime for a federal judge to ask a Senate aide for information about a pending judicial nomination. Oral Argument at 31:00–31:30. It's a peculiar approach to the Constitution—and contrary to common sense. *See, e.g., Never Say 'Nice to Meet You' and 27 Other Rules for Surviving in D.C.*, POLITICO, Feb. 17, 2023 ("D.C. is a formal city; to reach people, you often have to go through official channels—a communications director, or a press secretary. But if you need to ask a real question, or if someone needs to get in touch with you about something important, texting is the way to go. There's no better way to set up a meeting—without staff—or disclose substantive information than the humble text.").

Finally, the majority attempts to diminish the injury inflicted by the police officers and prosecutors on **Villarreal**. It notes that **Villarreal** was "detained, not ... jailed." *Ante*, at ——. It was only a "brief arrest." *Ante*, at ——. But **Villarreal's** complaint alleges that she was "detained at the Webb County Jail" and "released from physical detention at the Webb County Jail" on a $30,000 bond. If the majority thinks this is a material fact dispute, it's one that can be considered at trial. But more to the point, the legal analysis supporting today's grant of qualified immunity doesn't turn on what exactly happened to **Villarreal**. The majority's logic would readily lead to immunity if she had been convicted and incarcerated.

### F.

Today's ruling doesn't just disrespect **Villarreal's** rights. It disrespects the rights of every citizen in our circuit who might wish to seek information from public officials. And not just those citizens who seek information involving a crime. There are countless other exceptions to disclosure littered throughout Texas law besides § 552.108 of the Texas Government Code. Indeed,

the exceptions to disclosure aren't even limited to one particular chapter of one particular code (as noted, the majority cites a provision of the Transportation Code as an alternative basis for jailing **Villarreal**).

So a citizen may feel compelled to hire a lawyer before daring to ask a public official for information. But even hiring a lawyer may not be enough—as en banc oral argument in this case troublingly illustrates.

Many parents, for example, are enormously concerned about our public schools. Their concerns range from curriculum to school safety. Accordingly, the consideration and selection of a new school superintendent may be of great interest to many citizens. *See, e.g., Uvalde school chief plans to resign after community outrage*, AP, Oct. 22, 2022 ("Uvalde's school district superintendent announced Monday he plans to resign by the end of the academic year, following months of community outrage over the handling of the United States' deadliest school shooting in nearly a decade."); Hannah Natanson & Justin Jouvenal, *Loudoun schools chief apologizes for district's handling of alleged assaults, promises changes to disciplinary procedures*, WASH. POST, Oct. 15, 2021 ("After news of the second assault became public—with the sheriff's office putting out a release Oct. 7—parents in the Northern Virginia district of 81,000 exploded with anger and accusations of incompetence. They questioned why a student involved in a sexual assault was transferred to another high school, enabling that student to commit a second assault. At a heated board meeting Tuesday, some speakers called on the superintendent and school board to resign.").

So what if a citizen wishes to ask for the names of those being considered for superintendent, with plenty of time to investigate and publicly debate the potential candidates? Does Texas law make it a crime to ask this question? *See* TEX. GOV'T CODE § 552.126 ("The name of an applicant for the position of superintendent of a public school district is excepted from the requirements of Section 552.021, except that the board of trustees must give public notice of the name or names of the finalists being considered for the position at least 21 days before the date of the meeting at which a final action or vote is to be taken on the employment of the person.").

 **\*36** When this question was asked during en banc oral argument, counsel for Defendants confidently reassured us that such questions would not be a crime. Oral Argument at 28:55–29:45.

But counsel for the Texas Attorney General's office gave precisely the opposite response. She said that it would be a crime. Oral Argument at 1:00:38–1:01:00. [7]

If the attorneys who represent and advise local Texas law enforcement officials and the attorneys who work for the Texas Attorney General can't agree on which questions can put a citizen in prison, it's no wonder that courts have repeatedly found the Texas law unconstitutionally vague. [8]

So the take-away from today's ruling is this: Any citizen who wishes to preserve her liberty should simply avoid asking public officials for information outside of the formal (and time-consuming) channel of the Public Information Act. But if you ask for public information using the wrong mechanism, you may go to prison. *See* Oral Argument at 30:20–25 ("Wrong procedure, so jail?" "Right.").

This vision of democracy will no doubt sound idyllic to bureaucrats who favor convenience to the government over service to the citizen. But it's dreadful to anyone who cherishes freedom.


## II.

**Villarreal** also presents a claim of First Amendment retaliation. That is, separate and apart from Defendants' interference with her right to ask questions, **Villarreal** alleges that Defendants arrested her in retaliation for expressing viewpoints critical of local law enforcement.

I agree with, and concur in, Judge Higginson's eloquent articulation as to how **Villareal** has alleged a valid First Amendment retaliation claim. It seems obvious, and **Villarreal's** complaint amply alleges, that others have asked Laredo officials countless other questions that would violate the same offense alleged by the government here. Yet the officials only targeted **Villarreal**—presumably because they dislike her views. *See, e.g., Villarreal*, 44 F.4th at 376 ("**Villarreal's** complaint sufficiently alleges that countless journalists have asked LPD officers all kinds of questions about nonpublic information. Yet they were never arrested."); *id.* (Defendants "knew that members of the local media regularly asked for and received information from LPD officials relating to crime scenes and investigations, traffic accidents, and other LPD matters."); *id.* ("**Villarreal** alleges, and Defendants concede, that LPD had never before arrested any person under § 39.06(c).").

The majority intimates that, under our circuit's precedents, **Villarreal's** retaliation claim fails as a matter of law. But if that is so, we could've used this very en banc proceeding to revisit those same precedents. Some members of this court have urged that very course in other cases, but each time, the majority has declined. *See Gonzalez v. Trevino*, 60 F.4th 906 (5th Cir. 2023); *Mayfield v. Butler Snow*, 78 F.4th 796 (5th Cir. 2023). So it's not surprising that the majority has declined to do so here.

 **\*37** Be that as it may, the Supreme Court recently granted certiorari to examine our circuit precedent in any event. *See Gonzalez v. Trevino*, ––– U.S. ––––, 144 S. Ct. 325, ––– L.Ed.2d –––– (2023).


### III.

As for **Villarreal's** remaining claims, I would allow her Fourth Amendment claim to proceed, for the reasons already detailed above, as well as the reasons so well stated in Judge Higginson's scholarly dissent. Even putting aside the obvious First Amendment problems, there was no probable cause to arrest her, because the arrest warrants did not even bother to recite, let alone substantiate, the elements of any crime under Texas law. To excuse these deficiencies, the majority emphasizes that the probable cause standard is "nontechnical" and "practical." *Ante*, at –––– (citing *Maryland v. Pringle*, 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003)). But the case the majority cites involves officers in the field, not sitting at their desks drafting affidavits.

I would also allow **Villarreal's** selective enforcement claim under the Equal Protection Clause, as well as her conspiracy claim, to proceed, for the reasons previously articulated by the panel majority. *See Villarreal*, 44 F.4th at 375–77.

* * *

According to an old Russian joke, a kid comes home from school and says: "Daddy, we had a civics lesson today, and the teacher told us about the Constitution. He told us that we have a Constitution, too—just like in America. And he told us that our Constitution guarantees freedom of speech, too—just like in America."

The dad responds: "Well, sure. But the difference is that the American Constitution also guarantees freedom *after* the speech."

I agree. Our Constitution guarantees **Villarreal's** freedom after her speech. We should have, too. I dissent.


### All Citations

--- F.4th ----, 2024 WL 244359

## Footnotes

\*      Judge RAMIREZ joined the court recently and elected not to participate in this case.

1      *See* Simon Romero, *La Gordiloca: The Swearing Muckraker Upending Border Journalism*, N.Y. TIMES, Mar. 10, 2019, https://tinyurl.com/4ntwktwy.

2      "[W]hen ruling on a Rule 12 motion, a court may consider "documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Armstrong v. Ashley*, 60 F.4th 262, 272 n.10 (5th Cir. 2023) (quoting *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009). **Villarreal's** complaint relies on, and references, criminal complaints, a search warrant affidavit and magistrate approval, and arrest warrant affidavits and approvals. Those documents were not attached to the complaint, but they are publicly available documents **Villarreal** incorporated in her complaint by reference and are central to her claims. **Villarreal** does not deny the information in those documents, although she alleges the documents were "manufacture[d]." Her conclusory allegation is insufficient to dispute all the information in the incorporated documents. "[C]onclusory statements, naked assertions, and threadbare recitals fail to plausibly show violations ... [of] clearly established constitutional rights." *Armstrong*, 60 F.4th at 269.

3      Officer Deyanira **Villarreal** shares Plaintiff-Appellant's last name. We are aware of no familial relationship between them.

4      **Villarreal** alleges Does 1 and 2 tipped DV. Does 1 and 2 are allegedly employees of either Laredo or Webb County.

5      The document indicates about 72 calls per month between **Villarreal** and Officer Goodman occurring from January 1 to July 26, 2017.

6      Officer Goodman deleted these messages, but LPD software retrieved them.

7      The Chief Judge concurred to the extent that the panel majority affirmed dismissal of **Villarreal's** First Amendment retaliation and municipal liability claims.

8      Ordinarily, a plaintiff must explain why each individual defendant is not entitled to qualified immunity based on that defendant's actions and the corresponding applicable law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Meadours v. Ermel*, 483 F.3d 417, 421 (5th Cir. 2007). Plaintiff failed to plead properly. However, the district court opinion, in concluding that the statute did not facially violate clearly established law and probable cause existed for the arrest, correctly found all defendants protected by qualified immunity.

9      We assume *arguendo* that Jacaman and Alaniz, Assistant District Attorneys, are counted among defendant officers despite their positions as prosecutors. Participating in the issuance of the warrants here was arguably outside their absolute prosecutorial immunity. *See* RICHARD H. FALLON JR., ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 1044 (7th ed. 2015) ("[P]rosecutorial immunity extends only to prosecutorial functions related to courtroom advocacy[.]"). Under this assumption, they are entitled to qualified immunity along with the police officer defendants. *See id.*

10      A similar provision restricts public servants: "A public servant commits an offense if with intent to obtain a benefit or with intent to harm or defraud another, he discloses or uses information for a nongovernmental purpose that: (1) he has access to by means of his office or employment; and (2) has not been made public." TEX. PENAL CODE § 39.06(b).

11    The TPIA requires agencies promptly to respond to requests for information, with appeal available to the state Attorney General and state courts. TEX. GOV'T CODE §§ 552.221(a), 552.234(a), 552.305(b), 552.325. In addition, the LPD employed a public information officer entrusted with reporting to the press and public.

12    Texas courts have held that the distinction between exceptions and outright prohibitions on disclosing information is irrelevant for purposes of section 39.06(c). See State v. Newton, 179 S.W.3d 104, 109 (Tex. App.—San Antonio 2005) (holding "the phrase 'prohibited from disclosure' in § 39.06(d)" means "the set of exceptions to disclosure listed in Subchapter C" of the TPIA); Texas v. Ford, 179 S.W.3d 117, 123 (Tex. App.—San Antonio 2005) (same); Tidwell v. State, No. 08-11-00322-CR, 2013 WL 6405498, at *12 (Tex. App.—El Paso 2013) (same).

13    See also TEX. GOV'T CODE § 552.108(a)(1)–(2) (exempting such information from disclosure).

14    Villarreal repeatedly alleges that the officials were motivated by animus toward her style of journalism and past criticism of LPD. We need not discuss this point, because it is well established that the motivation for an arrest is not relevant to its constitutionality. See Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L.Ed.2d 89 (1996). The extent to which motivation may affect Villarreal's retaliatory First Amendment prosecution claim is discussed in Section C.1 below.

15    The Supreme Court's recent decision in Thompson v. Clark, 596 U.S. 36, 142 S. Ct. 1332, 212 L.Ed.2d 382 (2022), is not to the contrary. That decision held only that actual innocence is not required as an element of a Fourth Amendment malicious prosecution claim. Id. at 1335.

16    Chief Justice Roberts's opinion for the Court in Heien traces this sort of immunity for reasonable mistakes of law back to Chief Justice John Marshall in United States v. Riddle, 9 U.S. (5 Cranch) 311, 3 L.Ed. 110 (1809). 574 U.S. at 62, 135 S. Ct. at 537.

17    The dissents inaccurately trumpet that district court decisions in Newton and Ford held sections 39.06(c) and (d) unconstitutionally vague. Even so, such rulings were abrogated by the court of appeals, which did not endorse the lower court's constitutional ruling when dismissing indictments on the statutory analysis that grand jury testimony is not included in the Open Records Act. It would have been judicially improper for the appellate court to rule on a constitutional ground when the statutory basis was not even applicable to the defendants. Moreover, these companion cases arose out of the same transaction, so they can hardly be disaggregated into two separate constitutional rulings.

18    Cf. Myers v. Anderson, 238 U.S. 368, 382, 35 S. Ct. 932, 936, 59 L.Ed. 1349 (1915) (rejecting immunity of officials against § 1983 liability for refusing to register black citizens to vote in plain violation of the Fifteenth Amendment). Myers, of course, does not deal with probable cause.

19    DeFillippo, it bears emphasis, is not limited to the exclusionary rule remedy for a constitutional violation—it applies to the determination of a Fourth Amendment violation itself. See Heien, 574 U.S. at 66, 135 S. Ct. at 539.

20    A handful of circuit court decisions that predate Heien denied qualified immunity where the courts held the underlying statutes or ordinances were "obviously unconstitutional." None is remotely similar to the case before us. See Leonard v. Robinson, 477 F.3d 347, 359 (6th Cir. 2007) (disruption of a public assembly with profanity); Lawrence v. Reed, 406 F.3d 1224, 1233 (10th Cir. 2005) (denial of due process); Carey v. Nev. Gaming Control Bd., 279 F.3d 873, 881 (9th Cir. 2002) (failure to provide ID to police).

      Two more recent decisions are no more apposite because they involve quite different First Amendment issues. Ballentine v. Tucker, 28 F.4th 54, 66 (9th Cir. 2022) (retaliatory arrest for "chalking" anti-police messages); Thompson v. Ragland, 23 F.4th 1252, 1255-56 (10th Cir. 2022) (discipline against college student exercising speech).

21    Villarreal makes conclusory allegations that Officer Ruiz "knew or should have known" that the information she published was not subject to a TPIA exception, and that Villarreal did not use her Facebook page "as a means of

economic gain." These allegations ask for conclusions of law, precisely the domain of the magistrate who oversaw issuance of the warrants. Yet Judge Higginson's dissent asserts these statements amounted to material misstatements and omissions that tainted the magistrate's neutral decisional process. How can that be? The terms of the statute and the TPIA regarding "nonpublic information" and "benefit" were exactly what the magistrate was called upon to apply to the facts before him. Any error about "benefit," it must also be recalled, is harmless because **Villarreal's** own pleadings admit she received "benefits" from her citizen journalism.

22    The Court examined the history of Freedom of Information Act laws and noted they "are of relatively recent vintage." *McBurney v. Young*, 569 U.S. 221, 234, 133 S. Ct. 1709, 1719, 185 L.Ed.2d 758 (2013) (holding the Virginia Freedom of Information Act did not violate the Privileges and Immunities Clause).

1     **Villarreal's** appeal is supported by, among other amici, the Texas Press Association, the Texas Association of Broadcasters, the Freedom of Information Foundation of Texas, the Reporters Committee for Freedom of the Press, the Texas Tribune, the Dallas Morning News, the National Association of Hispanic Journalists, and the Society of Professional Journalists. Together, they write that "**Villarreal** is a citizen journalist" who "provides a valued source of information for over 120,000 followers on local news and events, at a time when mainstream news organizations are increasingly stretched thin to cover community news."

2     Ian Shapira, *'It was insanity': At My Lai, U.S. soldiers slaughtered hundreds of Vietnamese women and kids*, THE WASHINGTON POST (March 16, 2018), https://www.washingtonpost.com/news/retropolis/wp/2018/03/16/it-was-insanity-at-my-lai-u-s-soldiers-slaughtered-hundreds-of-vietnamese-women-and-kids.

3     Seymour M. Hersh, *Torture at Abu Ghraib*, THE NEW YORKER (April 30, 2004), https://www.newyorker.com/magazine/2004/05/10/torture-at-abu-ghraib.

4     *Los Angeles Sheriff's deputies say gangs targeting "young Latinos" operate within department*, CBS NEWS (February 25, 2021), https://www.cbsnews.com/news/los-angeles-sheriffs-deputies-gangs-young-latinos.

1     Laurence H. Silberman, *Hoover's Institution*, WALL ST. J. (July 20, 2005), https://www.wsj.com/articles/SB112182505647390371.

2     *Compare* Transcript of Hearing on Defendant's Motion to Dismiss at 25, *Villarreal v. City of Laredo*, No. 5:19-00048 (S.D. Tex. Sep. 9, 2019), ECF No. 58 ("[I]mmunity doesn't apply if the allegations are sufficient to show... taint[ ] [a]nd that's exactly what happened with – Ms. **Villarreal** has alleged here, Your Honor."), *and id.* at 80 ("[T]hey selected a statute, applied it to her to arrest her knowing there was no probable cause" in order to "try[ ] to manufacture an arrest warrant affidavit[ ] to give the false impression that there was."), *and id.* at 98, 99 S.Ct. 2667 ("[E]ven though there's an intervening, you know, independent judicial officer where the defendants engage in acts that lead to omissions, lead to misstatements in the affidavit presented to the officer, that upsets that intervening authority. And you can't have qualified immunity as a result."), *with* Memorandum and Order at 14-15, *Villarreal v. City of Laredo*, No. 5:19-00048 (S.D. Tex. May 8, 2020), ECF No. 51 (paraphrasing paragraphs 90-93 of the first amended complaint, yet overlooking the taint allegation in paragraph 91).

3     *See also generally* Amanda Peters, *The Case for Replacing the Independent Intermediary Doctrine with Proximate Cause and Fourth Amendment Review in § 1983 Civil Rights Cases*, 48 PEPP. L. REV. 1 (2021).

4     Judge Ho sets forth this state law in his dissent. *See also State v. Newton*, 179 S.W.3d 104, 107, 111 (Tex. App. 2005) (affirming the trial court's decision, which had held § 39.06(c) and (d) "void for vagueness," on statutory grounds, and not addressing constitutional ruling); *State v. Ford*, 179 S.W.3d 117, 120, 125 (Tex. App. 2005) (same). **Villarreal** alleges in her complaint that she filed a habeas petition on February 14, 2018, arguing that § 39.06(c) was unconstitutionally vague and violated the First Amendment, and that on March 28, 2018, Judge Monica Z. Notzon of the 111th Judicial District of Texas granted **Villarreal's** motion, holding from the bench that the statute was unconstitutionally vague.

5    Although the panel majority in *Gonzalez v. Trevino*, 42 F.4th 487, 494 (5th Cir. 2022), distinguishes ***Villarreal*** on the ground that **Priscilla Villarreal's** arrest *was* a clear violation of the First Amendment, I acknowledge that I sharply differ from that majority in my interpretation of *Nieves.* Were *Gonzalez* not already before the Supreme Court, I would urge that we revisit its holding here en banc because the "comparative evidence" standard would raise an impossible bar—which is not required by the text of the *Nieves* decision—for plaintiffs. *See Gonzalez*, 42 F.4th at 503 (Oldham, J., dissenting) ("It's not clear that there will always (or ever) be available comparative evidence of jaywalkers that weren't arrested. Rather, the retaliatory-arrest-jaywalking plaintiff always (or almost always) must appeal to the commonsense proposition that jaywalking happens all the time, and jaywalking arrests happen virtually never (or never).")

1    *E.g., Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) ("breathing room"); *Plumhoff v. Rickard*, 572 U.S. 765, 775, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014) ("split-second judgments").

2    Qualified immunity's presumed purpose, to ensure "fair notice" before imposing liability, seems mislaid in slow-moving First Amendment situations where government officials can obtain legal counsel. *See Hoggard v. Rhodes*, ⎯⎯ U.S. ⎯⎯, 141 S. Ct. 2421, 2422, 210 L.Ed.2d 996 (2021) (Thomas, J., statement respecting denial of certiorari) ("[W]hy should university officers, who have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a spit-second decision to use force in a dangerous setting?").

3    *See ante*, at ⎯⎯, ⎯⎯, ⎯⎯, ⎯⎯.

4    *See ante*, at ⎯⎯ ("**Villarreal** and others portray her as a martyr for journalism. That is inappropriate. She could have followed Texas law ....").

5    Then again, in fairness, who among us has not *checks notes* contrived a premeditated, retributive, slow-motion plan —over several months and with the benefit of 24/7 legal counsel—to criminalize free speech and routine newsgathering by imprisoning those who ask uncomfortable, truth-seeking questions of government officials?

6    *See, e.g., Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) ("The central concept of [qualified immunity] is that of 'fair warning' ....") (quoting *Hope v. Pelzer*, 536 U.S. 730, 740, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

7    *See, e.g., Lawrence v. Reed*, 406 F.3d 1224, 1233 (10th Cir. 2005) ("[S]ome statutes are so obviously unconstitutional that we will require officials to second-guess the legislature and refuse to enforce the unconstitutional statute—or face a suit for damages if they don't.").

8    *See id.* at 1232 ("[T]he overarching inquiry is whether, in spite of the existence of the statute, a reasonable officer should have known that his conduct was unlawful."); *see also Mink v. Knox*, 613 F.3d 995, 1009–10 (10th Cir. 2010) (officer could not rely on criminal-libel statute to arrest a student blogger).

9    *See ante*, at ⎯⎯ (noting the officers' assumption that § 39.06, despite previously being invalidated, was constitutional and holding that "[t]his principle defeats **Villarreal's** contention"). My view is different: If a news-gathering citizen asks questions of her government—no force, no coercion, no deception—and if a government employee answers those questions outside of formal channels, the government can take it up with the employee. It cannot imprison the citizen for asking.

10   *See, e.g., Nieves v. Bartlett*, 587 U.S. ⎯⎯, 139 S. Ct. 1715, 1727, 204 L.Ed.2d 1 (2019).

11   42 U.S.C. § 1983.

12   *Ante*, at ⎯⎯.

13   365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

14    The most glaring made-up defense is the "clearly established law" test, which collides head-on with § 1983's broad and unqualified textual command. Even those who argue for *some* version of qualified immunity nevertheless disavow the clearly-established-law requirement. *See, e.g.*, Scott Keller, *Qualified and Absolute Immunity at Common Law,* 73 STAN. L. REV. 1337, 1345 (2021) ("[T]he common law test for overcoming [qualified] immunity looked quite different from the Supreme Court's modern clearly-established-law doctrine."). Other recent scholarship casts doubt on qualified immunity's entire historical underpinning. Alexander A. Reinert, *Qualified Immunity's Flawed Foundation,* 111 Cal. L. Rev. 201 (2023) (noting that § 1983's originally passed language contained a "notwithstanding clause," now missing for unknown reasons, that explicitly negated all state-law defenses, making clear that § 1983 claims are viable notwithstanding "any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary"). Not all scholars are convinced, however, including a prominent academic critic of qualified immunity who suggests that the repeal of the "notwithstanding clause" was a codifier's error that Congress nevertheless "passed into law" as part of the Revised Statutes of 1874. *See* William Baude, *Codifiers' Errors and 42 U.S.C. § 1983,* VOLOKH CONSPIRACY (June 6, 2023), https://reason.com/volokh/2023/06/12/codifiers-errors-and-42-u-s-c-1983/ ("This is a case where Congress itself passed a law that probably made a mistake, making substantive changes to the text when the revision was not supposed to."); *cf. Maine v. Thiboutot,* 448 U.S. 1, 4–5, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (holding that § 1983 can be used to enforce federal statutory rights because of its inclusion of "and laws," a phrase that might have been accidentally added through a codifier's error). But no matter where one falls on the scholarly debate surrounding the "notwithstanding clause," there really is no debate on the fundamental point that the "clearly established law" test is untethered from § 1983's text and history and nigh impossible to defend. *See Horvath v. City of Leander,* 946 F.3d 787, 800 (5th Cir. 2020) (Ho, J., concurring in the judgment in part and dissenting in part) ("Nothing in the text of § 1983—either as originally enacted in 1871 or as it is codified today—supports the imposition of a 'clearly established' requirement.").

1    The majority suggests I'm overreading *Sause.* It claims that the decision merely "remanded for further proceedings." *Ante,* at ——. But in fact, *Sause* "revers[ed] [the] grant of qualified immunity in a case seeking damages under § 1983 based on alleged violations of free exercise rights." *Tanzin,* 592 U.S. at 50, 141 S.Ct. 486.

2    *Lozman* and *Nieves* also rebut the majority's curious claim that "the motivation for an arrest is not relevant to its constitutionality." *Ante,* at —— n.14.

3    *See also, e.g., Glik v. Cunniffe,* 655 F.3d 78, 79 (1st Cir. 2011); *Abraham v. Nagle,* 116 F.3d 11, 15 (1st Cir. 1997); *Gulliford v. Pierce,* 136 F.3d 1345, 1348–1350 (9th Cir. 1998); *Mackinney v. Nielsen,* 69 F.3d 1002, 1007 (9th Cir. 1995); *Duran v. City of Douglas,* 904 F.2d 1372, 1376–77 (9th Cir. 1990).

4    The majority responds that <mark>Villarreal</mark> doesn't argue that § 39.06(c) is unconstitutionally vague under the First Amendment. *Ante,* at ——. But her complaint repeatedly alleges that Defendants arrested her under an "unconstitutionally vague" statute on which "no reasonable official would have relied," and that the statute was "vague to the average reader, and contrary to [ ] clearly established First Amendment right[s]." ***See* ROA.154 at ¶ 4; 169 at ¶ 82; 178 at ¶ 124; 202 at ¶ 256.** The First Amendment prohibits unconstitutionally vague laws—indeed, we apply "*stricter* standards of permissible statutory vagueness" to a statute that has a "potentially inhibiting effect on speech." *Smith v. California,* 361 U.S. 147, 151, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (emphasis added).

5    The majority claims that <mark>Villarreal</mark> is not the first to be prosecuted under § 39.06(c). But the very example the majority cites is the one that led to § 39.06(c) and (d) being held unconstitutional. *See Ford,* 179 S.W.3d at 120. The majority also notes that prosecutions have been brought against public servants under a different provision, § 39.06(b). It's not clear why the majority thinks this helps its cause.

6    The majority also makes a modest attempt to invoke § 550.065 of the Texas Transportation Code. *Ante,* at ——. But that provision applies to the disclosure of written collision reports prepared under certain enumerated provisions of the Transportation Code. No one claims that any such report is at issue here.

7     The Texas Attorney General plays a significant role in interpreting and enforcing the Texas Public Information Act. *See, e.g.*, TEX. GOV'T CODE § 552.011.

8     Disagreements over which questions are a crime under § 39.06(c) aren't limited to attorneys. The Texas Attorney General's office also disagrees with the majority. The majority concludes that "the distinction between exceptions and outright prohibitions on disclosing information is irrelevant for purposes of section 39.06(c)." *Ante*, at —— n.12. By contrast, the en banc brief of the Texas Attorney General's office concludes that only outright prohibitions on disclosure —and not discretionary exceptions—would trigger § 39.06(c). *See* Tex. Br. 19.

---

**End of Document**                           © 2024 Thomson Reuters. No claim to original U.S. Government Works.